UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORETON BINN and MARISOL F, LLC,

              Plaintiffs,

        v.

BRUCE T. BERNSTEIN, RICHARD K. ABBE,
ANDREW D. PERLMAN, SALVATORE
GIARDINA, ANDREW R. HEYER, DONALD E.
STOUT, JOHN ENGELMAN, and FORM
HOLDINGS CORP.

              Defendants.

Civil Action No.   1:17-cv-8594

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiffs Moreton Binn and Marisol F, LLC (together with Mr. Binn, the "Plaintiffs"), by their undersigned attorneys, as and for their complaint against Bruce T. Bernstein, Richard K. Abbe, Andrew R. Heyer, Salvatore Giardina, Donald E. Stout, John Engelman, Andrew D. Perlman, and Form Holdings Corp. ("FH" or the "Company" and together with the individual defendants, the "Defendants"), allege upon information and belief as follows:

### NATURE OF THE ACTION

    1.    In this action Plaintiffs seek recovery of damages resulting from misrepresentations made by Defendants in connection with the merger of XpresSpa Holdings, LLC ("XpresSpa") into Defendant FH. Before the merger, Plaintiffs, the founders of the XpresSpa brand, held a valuable minority interest in XpresSpa. Mistral Equity Partners and its affiliates ("Mistral"), led by Defendant Heyer, owned the majority equity interest in XpresSpa. Defendant Bernstein, through an investment vehicle had a substantial creditor relationship with XpresSpa.

2.     When the proposed merger was presented to the Board of Directors of XpresSpa, Mr. Binn was the member of the Board of Directors of XpresSpa who represented Plaintiffs' minority interest.  Heyer and Bernstein also sat on the Board of Directors of XpresSpa. Unbeknownst to Plaintiffs, however, Defendant Bernstein had a long-standing and close relationship with Defendants Perlman, Abbe, and Giardina.  Together, these individuals have an undisclosed arrangement, whereby they work as a group to take control over publicly traded companies for the purpose of using the public markets for their self-interest.  The Controlling Group often uses an initial ownership interest or onerous debt facility to first gain a foothold in a target company.  The merger between XpresSpa and FH is the result of a coordinated and premeditated effort by Bernstein, Abbe, Perlman, and Giardina (together, the "Controlling Group"), the true nature of which was concealed from the Plaintiffs when presented for consideration and a vote.

3.     Beginning in 2015, the Controlling Group targeted FH and XpresSpa by first using Perlman's existing directorship at FH to effect a change of control.  First, Perlman caused FH to enter in to a substantial credit facility with an investment vehicle controlled by Abbe.  Then, Perlman caused Bernstein, Abbe, and Giordina to be appointed as directors of FH, establishing majority control over the board.  They then negotiated a merger transaction with XpresSpa, represented by Heyer.

4.     To coerce XpresSpa to agree to the merger devised by the Controlling Group, Bernstein declared an event of default under a $6 million credit agreement between XpresSpa and an investment vehicle owned and controlled by Bernstein (the "Rockmore Note"). The purported grounds of the event of default rested on alleged violations of financial reporting covenants.  The event of default caused XpresSpa to lose access to certain other sources of credit.

At a meeting of the Board of Directors of XpresSpa, Bernstein stated that he would be willing to waive the Event of Default if the other members of the Board of Directors of XpresSpa would vote in favor of the merger with FH.  As part of the merger, the Controlling Group demanded that the same onerous credit agreement used by Bernstein to exercise undue control over XpresSpa (the "Rockmore Note") be transferred to and assumed by FH.

5.     The Controlling Group never disclosed to Plaintiffs the long-standing and close relationships between Bernstein, Abbe, Perlman, and Giardina or the arrangements made between for purposes of effectuating the merger.  Indeed, the Controlling Group represented that their respective appointments to the Board of Directors of FH were not made pursuant to any such arrangement.   They represented that each member of the Controlling Group was an independent director and that following the merger Bernstein would continue to qualify as an independent director of FH.   This was not true.   By way of FH's assumption of the onerous Rockmore Note and his stock ownership, Bernstein would no longer qualify as an independent director of FH.   Using the power provided by way of the Rockmore Note and directorship positions, Bernstein, along with Abbe, directed the efforts of the Controlling Group.  The other members of the Controlling Group lacked independence by way of their membership and participation in the Controlling Group and concerted efforts to further its goals.

6.     Moreover, in order to induce Perlman and Heyer to bring the merger to a closing, Bernstein and Abbe also entered into undisclosed *quid pro quo* agreements to grant to those individuals' equity compensation after the closing of the merger.   These *quid pro quo* agreements were concealed from Plaintiffs.   Defendants Stout and Engelman had a fiduciary duty to learn the truth about the Controlling Group and the merger but failed to do so.

7.     Had Plaintiffs known of the foregoing, they would have voted in

opposition to the merger, taken action to prevent the merger, or otherwise sought to dispose of their interest by other means.  Accordingly, Plaintiffs were damaged by the foregoing scheme and misrepresentations.

8.      After the merger, the Controlling Group used their undue control and power over FH to operate the company for their own selfish interests by awarding themselves and their friends unreasonable compensation and below market pricing on equity offerings that substantially diluted Plaintiffs' interests.

9.      Further, at the same time that the Controlling Group was scheming to take over control, XpresSpa was a party to a letter of intent that provided Amiral Holdings SAS ("Amiral"), which operates a competing airport spa business—Be Relax.  The letter of intent provided to Amiral a binding right of first refusal to an equity interest in XpresSpa.  Heyer, as Chairman of the Board of Directors of XpresSpa, and Bernstein, as Director of XpresSpa, knew or should have known of the contractual obligations to Amiral.  Yet they caused XpresSpa to breach its agreement with Amiral by proceeding with the FH merger.

10.      By this action, Plaintiffs seek recovery from the Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), material omissions and misrepresentations in breach of fiduciary duties owed to the Plaintiffs, expropriation in breach of fiduciary duties owed to the Plaintiffs, and unjust enrichment against the Defendants.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted in this action.

12.     Venue is proper in this district in accordance with 28 U.S.C.§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

### Plaintiffs

13.     Plaintiff Moreton Binn is an individual residing in Fairfield County, Connecticut.  Mr. Binn is a shareholder of FH.

14.     Plaintiff Marisol F, LLC is a limited liability company organized and existing under the laws of the State of New York.  The principal offices of Marisol F, LLC are located at c/o Ahn Law Group LLC, 85 Broad Street, 16th Floor, New York, NY  10004. Marisol Binn is the sole member of Marisol F, LLC.  Marisol Binn is a resident of Fairfield County, Connecticut.  Marisol F, LLC is a shareholder of FH.

15.     Moreton Binn and Marisol F, LLC (together, "Plaintiffs") obtained their shares in FH when XpresSpa was acquired by FH and their units in XpresSpa were converted to Common and Preferred Shares in FH.  Plaintiffs also received warrants in FH.

### Individual Defendants

16.     Defendant Bruce T. Bernstein is an individual and has been a director of FH since February 8, 2016 and a member of the compensation and audit committees of the Board of Directors of FH since February 8, 2016.  Bernstein also serves as a member of the nominating and corporate governance committee of FH.  Before the merger, Bernstein was a member of the Board of Directors of XpresSpa.  Bernstein owns and/or controls Rockmore Investment Master Fund Ltd. ("Rockmore") through which he owns the Rockmore Note and acts on behalf of the Controlling Group.

17.     Defendant Richard K. Abbe has been a director of FH since March 9,

2016.  Abbe owns and/or controls Iroquois Master Fund Ltd., an investment vehicle through which he acts on behalf of the Controlling Group.

18.     Defendant Salvatore Giardina is a an individual and has been a director of FH since May 23, 2016 and a member of the audit committee of the Board of Directors since the same date.  The Controlling Group has appointed Giardina to director positions in several public companies.

19.     Defendant Andrew D. Perlman is an individual and has been a director of FH since September 2009.

20.     Defendant Andrew R. Heyer is an individual residing in Westchester County, New York.  Heyer has been a director of FH since December 23, 2016.  Heyer is the founder and CEO of Mistral.

21.     Defendant Donald E. Stout is an individual and has been a director of FH since July 19, 2012.  Stout served as a member of the compensation, audit, and nominating and corporate governance committees of the Board of Directors of FH.

22.     Defendant John Engelman is an individual and has been a director of FH since December 2010.

### The Company

21.     Defendant Form Holdings Corp. is a corporation organized and existing under the laws of the State of Delaware. The principal offices of FH are located at 780 Third Avenue, 12th Floor, New York, NY 10017.

### FACTUAL BACKGROUND

### The Controlling Group

23.     FH is a public company formerly known as "Vringo, Inc."  Prior to 2016, the Company was engaged primarily in the business of monetizing patent portfolios through

litigation, and before that, was engaged primarily in developing ringtones.  Since approximately 2012, Defendant Perlman has served as the Chief Executive Officer of the Company.  Perlman is a member of a the Controlling Group, including Defendants Bruce R. Bernstein, Richard K. Abbe, and Salvatore Giardina, that have an undisclosed arrangement between them to use collective efforts to gain control over publicly traded companies and used such control for their own personal benefit.

24.     Prior to targeting FH, the Controlling Group has previously used similar schemes to gain influence and control over publicly traded companies and then use the companies for their own self-interests and aggrandizement.  To effect these outcomes, the Controlling Group has used various investment vehicles, such as Rockmore, controlled by Bernstein, and Iroquois, an investment vehicle controlled by Abbe.  Generally, the Controlling Group will first take a position in the target company by way of the acquisition of a substantial ownership of the target company's stock or by causing one of their investment vehicles to enter into a convertible debt facility or other debt financing on coercive terms.

25.     Following the initial investment, Abbe, Bernstein, or another member of their group, will then use their initial foothold position to cause other members of the group to be appointed to the Board of Directors of the target company.  Once one member of the Controlling Group is appointed to a board, other members of the Controlling Group are quickly appointed to directorships until the group attains the power to control the affairs of the target company.

26.     Members of the group are then appointed to the Audit and Compensation Committees of the target company.  Once the group has effected a change of control, they grant themselves valuable compensation and use the target company to refinance the initial investment on favorable terms.

27.     For example, in 2014, Salvatore Giardina held a foothold directorship in National Holdings Corporation ("NHC").  Abbe and a business partner from Iroquois sent a notice of an intent to nominate a slate of three directors to stand for election at the upcoming annual meeting to the board of directors of National Holdings Corporation ("NHC").  Following this notice, NHC agreed to an investor settlement agreement that, *inter alia*, caused Abbe to be appointed to the board of directors and the board to nominate Abbe's Iroquois business partner as a director.  Upon the declination of one current director to stand for re-election and the resignation of another board member immediately following the annual meeting, the board of NHC formed a strategy committee of the board to be comprised of six non-management members, including either Abbe or his Iroquois business partner, *inter alia*.  Salvatore Giardina, by way of his undisclosed arrangement with Abbe, remained on the board after the investor settlement agreement.  In their activities directed towards NHC, Abbe and his business partner, as well as Giardina, voted as directed by Abbe and another Iroquois partner for the purpose of exercising control over the affairs of NHC.  Immediately following the Annual Meeting in July 2014, the newly-formed Strategy Committee included Abbe, his Iroquois business partner, and Giardina.  In or about September 2016, Abbe and Giardina caused NHC to complete a tender offer by a subsidiary of Fortress Biotech, Inc., receiving a premium in exchange for their initial investment while diluting the existing shareholders of NHC.

28.     In 2016 Perlman, Bernstein, and Abbe used similar means to effect a change of control of a public company named Neurotrope, Inc. ("Neurotrope").  Neurotrope is a startup biotechnology company that licenses its core technology from another entity.  First, Abbe caused Iroquois to take a 9.99% beneficial interest in Neurotrope.  Then, in connection with a public offering disclosed in July 2016, Abbe caused Iroquois to commence a litigation against

Neurotrope.  Abbe agreed to settle the litigation in exchange for an increase in the size of the board of directors and the appointment of a fellow Iroquois partner to the board of directors of Neurotrope.  Shortly thereafter, the board was increased again and, on November 14, 2016, Bruce Bernstein was appointed as a director of that company.  Pursuant to the undisclosed arrangement between Abbe and Bernstein, Bernstein was appointed as the Chairman of the Audit Committee and also a member of the Compensation Committee, Nominating and Corporate Governance Committees of the Board of Directors of Neurotrope.

29.     In short order, Perlman was also elected as a director and appointed to the Audit and Compensation Committees.  Bernstein, Perlman, and Abbe's fellow Iroquois partner all voted to award to themselves, and continue to receive, valuable shares of Neurotrope stock.

30.     Members of the Controlling Group, acting through various investment vehicles such as Rockmore and Iroquois, have coordinated similar changes in control or other coordinated activities with respect to GeoResources, Inc., USA Technologies, Inc., and TapImmune, Inc.

31.     Upon information and belief, the existence of such a close and coordinated arrangement between the members of the Controlling Group is a material fact required to be disclosed under the securities and other laws.  One or more members of the Controlling Group were also appointed, and/or held themselves out, as an 'independent' director.  This was false, inaccurate, and/or misleading and the members of the Controlling Group failed to disclose, and otherwise concealed, the foregoing close relationships and arrangements when seeking directorships or roles with the target companies.

### The Controlling Group Effected a Change of Control in FH to Further Their Own Self-Interest

32.     Beginning in or around August 2014, the FH's patent monetization

business suffered several negative outcomes.  For example, the United States Court of Appeals for the Federal Circuit reversed a district court finding of patent infringement against Google and in favor of the Company.  In subsequent proceedings, the Supreme Court of the United States denied the Company's request for a writ of certiorari in the Google matter.  In January 2015, the People's Republic of China's National Development and Reform Commission (NDRC) threatened the Company with criminal sanctions unless the Company resolved its ongoing, worldwide patent disputes with ZTE.  Following these events, it became clear to Perlman that the Company's patent monetization business would no longer generate the returns it previously generated.

33.    In light of his dealings with the other members of the Controlling Group, Perlman alerted them to the distressed circumstances of FH.  In or around 2015, the Controlling Group formed a plan to capitalize on the Company's distressed patent monetization business to effect a change in control of the Company for their own self-interests.

34.    First, in or around May 2015, Perlman and Abbe caused the Company to enter into a $12.5 million convertible debt financing with Iroquois.  This debt facility provided the Controlling Group a foothold interest in the Company.  By way of the NDRC's demands to settle the Company's patent monetization campaign against ZTE, Perlman knew or should have known that the Company would shortly settle those disputes in exchange for a cash payment. The debt facility with Iroquois was otherwise unnecessary to the operation of the Company. Indeed, less than six months later, in December 2015, the Company announced a settlement with ZTE Corp. for $21.5 million.

35.    At the same time, Bernstein, acting through Rockmore, an entity he owns and controls, was the holder of a $6.5 million senior secured Rockmore Note payable by

XpresSpa. The terms of the Rockmore Note are onerous on their face and provided to Rockmore (*i.e.* Bernstein) control over the use of proceeds and certain operations of XpresSpa.

Specifically, the Rockmore Note, as amended, provides for base monthly interest, ranging from 8.5% to 10%, depending on whether the maturity date of the loan is extended to May 2019, plus accrued monthly interest of 2% annual interest, calculated on a monthly basis. According to FH's public filings prior to the completion of the merger, the Rockmore Note accrues interest of 9.24% per annum, payable monthly, plus an additional 2.0% per annum, and matures on May 1, 2018, with an additional one-year extension if both FH and Rockmore consent to such extension.

36.    Recognizing the power and control arising from the onerous terms of the Rockmore Note, Perlman, Bernstein, Abbe, and the other members of the Controlling Group formulated a scheme by which they would take control over FH and cause it to acquire XpresSpa, thereby replacing the Company's patent monetization business with the health and wellness business of XpresSpa.

37.    In the process, they would use their new control over the Company to use the settlement proceeds obtained from the ZTE settlement to repay the convertible debt owed to Abbe (through Iroquois) and transfer the Rockmore Note to the books of FH. They also agreed to appoint themselves to the Board of Directors of FH and award to themselves and their friends unwarranted compensation.

38.    In exchange for his cooperation in furthering the scheme, the Controlling Group agreed to grant to Perlman the maximum amount of equity compensation allowable under FH's executive compensation plan and, also, to appoint Perlman to the Board of Neurotrope, Inc., another public company controlled by Abbe and Bernstein.

**Defendants Effected a Change in Control
of FH For Their Own Benefit**

39.     Beginning in December 2015 and continuing through April 2016, Perlman, Bernstein, and Abbe entered into negotiations with Mistral, the majority equity holder of XpresSpa, controlled by Heyer.

40.     As negotiations with Mistral progressed, Bernstein, Abbe, and Perlman took steps to secure their control over FH.  First, on February 8, 2016 they appointed Bernstein as a member of the Board of Directors and Chair of the Compensation Committee.  In March 2016, Perlman and Bernstein caused FH to appoint Abbe as a director.  Following the appointment of Bernstein and Abbe to the Board, the Defendants certified that Bernstein satisfied the criteria for independence required under the listing rules of The NASDAQ Capital Markets LLC ("NASDAQ").  In May 2016, Perlman, Bernstein, and Abbe caused FH to appoint Giardina as a director.  With the appointment of Giardina, the Controlling Group held a majority of seats on the Board of Directors of FH.

41.     The Controlling Group then proceeded to finalize the terms of a merger transaction between FH and XpresSpa.  Among other things, these terms provided that following the acquisition, Bernstein would beneficially own a 4.7% interest in FH and Bernstein would continue his appointment as a member of, and the Chair of, the Compensation Committee and a member of the Audit, Nominating and Corporate governance committees of the Board of Directors of FH.

42.     Significantly, the Controlling Group requested that by way of the merger transaction, the obligations of XpresSpa under the Rockmore Note would be transferred to and assumed by FH.  The terms and covenants of the Rockmore Note provide to its holder extensive power and control over the obligor by way of onerous reporting covenants and the requirement

of Rockmore's consent as to the obligor's use of the proceeds and business operations.

43.     For example, in order to induce the members of the Board of Directors of XpresSpa to vote in favor of the proposed merger with FH – formerly known as "Vringo, Inc." – Bernstein caused Rockmore to declare, on or about June 7, 2016, an Event of Default under the Rockmore Note.  The purported grounds for the event of default was that XpresSpa had failed to satisfy the financial reporting covenants required under the Rockmore Note.

44.     Once Rockmore issued the default notice, Heyer and Mistral told Moreton Binn and the other board members that XpresSpa was in dire need of funds and unable to qualify for certain credit transactions, forcing it to seek additional financing for the company.

45.     At a meeting of the Board of Directors of XpresSpa held on or about June 14, 2016, Bernstein stated in sum or substance that Rockmore **"may be willing to declare the notice of default cured if certain conditions are met, including (but perhaps not limited to) Rockmore becoming comfortable that the 'V' deal is firmly in place."**  Upon information and belief, the "V" deal refers to the merger and acquisition with Vringo, Inc., now known as Form Holdings Corp.  Bernstein also demanded that an additional $500,000 be added to the outstanding principal owed under the Rockmore Note.

46.     By way of Bernstein's control over Rockmore, and the coercive nature of the covenants in the Rockmore Note, Bernstein held power and control over XpresSpa over and above that of an ordinary debtor-creditor relationship or that which would otherwise arise from mere stock ownership.

47.     Thus, the terms and covenants of the merger agreement providing for the transfer of the obligations under the Rockmore Note from XpresSpa to FH would necessarily provide to Bernstein the same level of power and control over FH that he enjoyed over XpresSpa.

48.     While Bernstein may have qualified as an independent director of FH while the Rockmore Note remained an obligation of XpresSpa only, Bernstein's stock ownership in FH, in combination with his ownership of a Rockmore Note that was destined to become an obligation of FH, would cause Bernstein to no longer qualify as an independent director of FH under Listing Rule 5605(a)(2) of the The NASDAQ Capital Markets LLC ("NASDAQ").

49.     In addition, Bernstein had informed Moreton Binn that Abbe or Abbe's investment vehicle, Iroquois, had provided half of the $6.5 million Rockmore Note.  To the extent Abbe or Iroquois has an interest in the Rockmore Note, Abbe does not qualify as an independent director of FH under Listing Rule 5605(a)(2) of NASDAQ.

50.     Further, in his position as a member of the Audit Committee of FH, Bernstein was one of three directors responsible for approving the assumption by FH of the obligations of the Rockmore Note.  To preserve a semblance of independence, any Director who is involved in a related person transaction cannot serve on the Audit Committee with responsibility for approving related person transactions.

51.     Despite the foregoing, Defendants represented in certain securities filings at or around the time of the acquisition and thereafter that Bernstein "[would] be deemed 'independent' in accordance with the standards set by The NASDAQ Capital Market. . . ."  The foregoing statement is false because following the acquisition Bernstein would not and does not satisfy the standards of independence set by NASDAQ.  The Controlling Group also failed to disclose in SEC filings or to Plaintiffs the true nature of the relationship and arrangements between members of the Controlling Group.

52.     The Controlling Group unduly influenced Andrew Heyer, Chairman of the Board of XpresSpa at the time of the merger with FH, by presenting to him an undisclosed

promise of additional stock options upon close of a merger transaction.  This promise of a stock grant was a *quid pro quo* for Heyer's assistance in bringing the deal to fruition, even when doing so would result in the violation of the prior letter of intent between XpresSpa and Amiral.  Heyer was also offered, and received, an appointment to the Board of Directors of FH.  On January 17, 2017, following the closing of the merger, Heyer did in fact receive his *quid pro quo* in the form of an option grant of 85,000 securities at an exercise price of $2.12, which vested quarterly over a one-year period with the initial quarter of shares vesting upon grant.

53.     As of August 7, 2016, the Controlling Group circulated draft merger documents to the members of XpresSpa, including a draft merger agreement.  The Merger Agreement described the legacy shareholders of XpresSpa as XpresSpa "Unitholders."   In exchange for the cancellation of their shares of XpresSpa, the Unitholders, including the Plaintiffs, would receive common stock in FH, series D convertible preferred shares of FH, and five-year warrants to purchase common stock of FH.  Certain liabilities concerning prior business of XpresSpa would be subject to an Escrow Agreement and charged against the preferred shares held in escrow.  Preferred shares with a specified initial liquidation preference value would be held in escrow as security against such liabilities.

54.     As agreed by the Controlling Group and Heyer, the merger agreement further provided that the Rockmore Note would become a direct liability of FH.  In the prospectus prepared by Pearlman, however, Defendants failed to disclose that the transfer of the Rockmore Note from the books of XpresSpa to the books of FH would cause Bernstein to no longer satisfy the criteria for independence required under the listing rules of NASDAQ.  Instead, Defendants falsely certified that Bernstein would continue to qualify as an independent director and a member of the audit and compensation committees.

55. They also misrepresented the terms and covenants of the Rockmore Note. In filings made in and around August 8, 2016 in connection with the proposed merger, and as of the filing of FH's most recent proxy statement on September 25, 2017 (the "September Proxy Statement"), Defendants included the following self-serving and false statement about the Rockmore Note: "We believe the terms of the [Rockmore Note] were reflective of market rates as of the time of issuance."

56. This statement is materially misleading and inaccurate as the terms of the Rockmore Note are on their face not in accordance with market rates and provide to its holder coercive power over the obligor that was not adequately disclosed. Moreover, the original principal balance of the Rockmore Note remains $6.5 million. The fact that the principal amount has not been paid down after years of interest payments indicates that the terms of the Rockmore Note were never "market" and, instead, served only as a tool by which the Controlling Group could assert and maintain control over FH over and above the level of voting control ordinarily deriving from stock ownership.

57. On or about August 7, 2016, the board of directors of FH voted in favor of consummating the merger agreement. On August 8, 2016, the board of directors of XpresSpa voted in favor of entering into the merger agreement with FH.

58. By failing to disclose both Bernstein's inability to meet the standards of independence required by NASDAQ, and instead misrepresenting such independence, the existence of a long-standing and close business relationships and arrangements between the members of the Controlling Group concerning overlapping directorships and ownership interests in various public companies, and the *quid pro quo* agreements entered into in connection with the proposed merger, the individual Defendants falsely misrepresented to Plaintiffs, by omission

or otherwise, the facts surrounding the merger transaction.

59.     The foregoing information was material and should have been disclosed. Had Plaintiffs known the true nature of the foregoing undisclosed relationships and *quid pro quo* agreements, or Bernstein's and Abbe's lack of independence following the merger, Plaintiffs would have voted in opposition to the merger transaction and taken other steps to protect the value of their interest in XpresSpa.

60.     Defendants did not disclose material information concerning the existence of the close relationship between the members of the Controlling Group until well after the merger transaction closed.  For example, in an amended annual report, Form 10K-A, filed by FH on or about May 1, 2017, Defendants disclosed that Giardina previously held a board positions at NHC.  Nonetheless, the same Form 10K-A fails to disclose Abbe's prior roles at NHC.

61.     In the same aforementioned Form 10K-A, Defendants first disclosed Bernstein's role on the Board of Directors of Neurotrope.  Such information was not disclosed in filings made before the merger transaction.

62.     The individual Defendants Engelman and Stout also acted as directors of FH during the relevant time period and, in that capacity, signed certain reports filed with the SEC during the relevant time period.   As such, they had a duty to obtain knowledge of the malfeasance of the Controlling Group before signing or otherwise authorizing the filing of reports, certificates, and other documents with the SEC.  Engelman and Stout misrepresented, by omission or otherwise, the true nature of the relationship between the Controlling Group by deliberately refraining from taking those steps necessary to discover whether statements by the Controlling Group and the Company were false or misleading.

### Misrepresentations Concerning The Necessity Of The Merger
### And Lack Of Other Willing And Available Acquirors

63.     Bernstein and Heyer, in their roles as board members of XpresSpa, made material false statements about the necessity of the merger and availability of other options for the company in their effort to force the merger with FH.

64.     Specifically, on or about August 8, 2016, Heyer caused Mistral to invest $1,733,828 with FH. On or about the same date, FH used these funds to purchase 1,733,826 Series C Preferred Units of XpresSpa, providing XpresSpa with capital that became necessary following the declaration of an event of default by Rockmore.  Heyer could have caused Mistral to make this investment of funds directly in XpresSpa, but in light of the undisclosed *quid pro quo* agreement with the Controlling Group, investing this capital though FH served the self-interest of himself, Bernstein, and the other members of the Controlling Group over and above the other shareholders of XpresSpa.  This transaction resulted in Mistral owning 750,574 common shares in FH. The price paid by Mistral was $2.31 per share, which is about 8% greater than the highest price paid for the stock that day on the open market.

65.     Moreover, Bernstein could have caused Rockmore to waive or otherwise modify the alleged default in XpresSpa's reporting obligations under the Rockmore Debt, which would have allowed XpresSpa to access other sources of debt or capital more easily.

66.     In addition, at that time, XpresSpa had already entered into an agreement providing to Amiral a right of first refusal with respect to an acquisition of an interest in XpresSpa.  Despite their prior knowledge of the right of first refusal granted to Amiral, Heyer and William Phoenix, Heyer's colleague at Mistral, urged on by Bernstein, caused XpresSpa to walk away from that agreement.  This act led to a litigation by Amiral against XpresSpa and Mistral.  This matter was settled on or about February 16, 2017. Heyer agreed to allow the costs

associated with this litigation to be charged against the amounts due to the legacy XpresSpa shareholders. Moreover, Bernstein was a named party in the Amiral/XpresSpa lawsuit and his legal fees, totaling $212,000 were reimbursed by FH in March 2017.  This amount should be considered as part of Bernstein's compensation.

67.     Further, Heyer, and his colleagues at Mistral, told Plaintiffs that they had engaged a third party to assist Mistral to find another party willing to invest in XpresSpa. But Heyer refused to allow Moreton Binn, one of the two founders of XpresSpa, to participate in any of the meetings with potential investors and only invited Marisol Binn, the other founder of the brand, to participate in one meeting with a potential investor. Heyer told Plaintiffs that they were not able to find any solutions to XpresSpa's need for capital other than the merger with FH.

68.     The XpresSpa/Amiral obligation was known to Heyer and Bernstein at the time of the August merger agreement. This should have been accounted for as one of the known liabilities.

69.     At the time that they were presented with the merger agreement on or shortly before August 8, 2016, the XpresSpa board was told that FH was valuing the XpresSpa at approximately $35 million.  XpresSpa Unitholders would receive $2.5 million worth of common shares in FH at the closing of the merger, in addition to 494,792 shares of fully paid and non-assessable shares of FH Series D Convertible Preferred Stock, par value $0.01 per share, and warrants to purchase an aggregate of 2,500,000 shares of FH Common Stock with an exercise price of $3.00 per share.  In part because of the purported event of default declared by Bernstein under the Rockmore Note, and the other conduct of Bernstein and Heyer, the foregoing valuation of XpresSpa is misleading and inaccurate by substantially undervaluing XpresSpa at the time of the merger transaction.

70.     The Defendants continue to make material misrepresentations.   For example, on September 25, 2017, Defendants, together as members of the board, and, specifically Perlman as Chief Executive Officer, caused a proxy statement to be filed that falsely states that Bernstein is an independent director pursuant to the listing rules of NASDAQ.

### The Controlling Group of Defendants Used Their
### Influence to Enrich Themselves and Their Friends

71.     Following the merger, Bernstein, Abbe, and the other members of the Controlling Group used their control and influence over FH to serve their own self-interests.   For example, as chair of the compensation committee, Bernstein used his office to award to himself additional compensation over and above that awarded to any of the other members of the Board. Defendants also continued to falsely certify that Bernstein qualified as an independent director under the listing rules of NASDAQ.

72.     Following the acquisition, the Rockmore Note became an obligation of FH. By way of the terms, conditions, and covenants of the Rockmore Note, and through Bernstein's controlling interest in Rockmore, Bernstein and the other members of the Controlling Group exerted undue control and influence over FH over and above that which ordinarily would accrue to them by way of their ownership of shares of FH stock.   Bernstein used such control to *inter alia* award to himself compensation in excess of that awarded to other non-employee directors who served on the compensation and audit committees.   Bernstein also awarded to Perlman, as promised, the maximum amount of compensation permissible under the Company's executive compensation plan.   Such compensation constitutes a *quid pro quo* for Perlman's efforts to appoint Bernstein to the Board.

73.     Bernstein, Abbe, and the Controlling Group used their undue influence and control over the compensation committee to award to Perlman the maximum amount of

stock option awards permitted under the Company's executive compensation plan, in satisfaction of their undisclosed *quid pro quo* arrangement for Perlman's assistance in the appointment of Bernstein to the board of FH and the transfer of the Rockmore Note from an obligation of XpresSpa to an obligation of FH, a company with the ability to raise funds from the public markets.

74.     On or about July 26, 2017, Defendants announced that FH had entered into an agreement whereby the Company would offer, through Roth Capital Partners, its underwriter, 6,000,000 shares of common stock for a price of $1.10 per share (the "July Issuance").   The day before Defendants announced the agreement, the market price of FH common stock was $1.36.

75.     The stated use for the proceeds of the July Issuance was "for capital expenditures associated with opening new XpresSpa locations and general corporate purposes." Upon information and belief, this additional capital actually was intended to service the Rockmore Debt and to pay the compensation for the executives and board members.

76.     The prospectus prepared by Defendants stated that the shares sold in connection with the foregoing offering would be subject to lock-up agreements precluding the purchasers from selling, without the consent of Roth Capital Partners, the newly issued shares within 90 days from the offering.

77.     Nonetheless, on August 4, 2017, AWM Investment Company, Inc. ("AWM") filed an initial statement of beneficial ownership disclosing that it had acquired 2,954,545 shares through the offering.  Abbe, through Iroquois, has co-invested with AWM in numerous other publicly traded companies.  Despite the Defendants' representation as to a lock-up restriction, within a few days, AWM began selling its shares of FH stock for a substantial and

unwarranted gain.

### Defendants' Material Omissions About Their Relative Independence

78.     Defendants failed to disclose their numerous and overlapping business relationships to Plaintiffs.

79.     Specifically, as discussed above, in the S-4 filed by FH on September 9, 2016, Defendants failed to disclose that Abbe's investment company, Iroquois, filed a lawsuit against NHC at the time that Giardina was a member of the board and chairman of the NHC's audit committee.  Despite significant changes to the board of NHC as part of the settlement of the lawsuit, including the appointment of Abbe and his then-investment partner to NHC's board, Giardina remained on the board and chairman of the audit committee after Iroquois's investment and litigation.

80.     Similarly, as discussed above, Perlman, as the Chief Executive Officer of FH, failed to disclose in any of the filings with the SEC prior to the close of the merger that Bernstein had been appointed to the board of directors of Neurotrope, Inc. as of November 14, 2016.  Bernstein's appointment to the Neurotrope board at the direction of Abbe was a further *quid pro quo* for Bernstein's assistance in facilitating the merger with FH.

81.     These undisclosed business relationships between the directors bely the claims of director independence made by Perlman and the other members of the Controlling Group in FH's public filings.

82.     Perlman and the other members of the Controlling Group had a duty to disclose to Plaintiffs these additional business relationships between FH's directors.

83.     The fact that FH amended its 10K long after the closing of the merger to include information about Perlman and Bernstein's board membership at Neurotrope further

supports that this information was material at the time of the close of the merger.

### Scienter

84.     As detailed above, Defendants had both the motive and opportunity to make the foregoing fraudulent misrepresentations and commit violations of the securities laws. The Defendants who were on the FH board prior to the merger were motivated to move forward with the merger because FH did not have a business likely to generate significant cash revenue after the settlement with ZTE in December 2015.  In addition, the other Defendants had the opportunity presented to them by Abbe and Bernstein.

85.     As detailed above, there is strong circumstantial evidence of *quid pro quo* arrangements provided to Heyer, Perlman, and Bernstein to entice them to move forward with the merger pursuant to terms that were detrimental to Plaintiffs.

### Reliance

86.     Plaintiffs relied on the material misrepresentations and omissions alleged herein.  Moreton Binn, as a member of the XpresSpa board, voted in favor of the merger on the basis of the material misrepresentations and omissions as detailed above.

### Loss Causation

87.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.

88.     In connection with the merger and acquisition of XpresSpa by FH, Plaintiffs purchased FH stock at artificially inflated prices and were damaged thereby.  Plaintiffs also gave up the opportunity to pursue other options concerning their interest in XpresSpa.

89.     After the merger, the Defendants used their undue influence and control over the Company to award to themselves excessive compensation and to enrich their friends, thereby causing Plaintiffs' losses.

90.     In addition, after the merger, Heyer used his position as the Unit Representative to agree to a lower purchase price, decreasing the number of shares owned by Plaintiffs held in escrow, causing Plaintiffs' damages.

**COUNT I**
**Violation of § 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(against all Defendants)**

91.     Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

92.     Beginning in December 2015 and continuing today, Defendants have carried out a plan, scheme, and course of conduct which was intended to and, did: (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase FH stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the individual Defendants took the actions set forth herein.

93.     The Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to benefit the Defendants at the expense of shareholders and the Company, in violation of §10(b) of the Exchange Act and Rule 10b-5. The Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

94.     The Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about

Bernstein's lack of independence and the prior relationships between Perlman, Bernstein, Abbe, and AWM, as specified herein.

95.     The Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the benefits of the merger with XpresSpa, Bernstein's purported independence, and the lock-up period of the offering. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the foregoing not misleading.   As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from the investing public.   Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Defendants awarded to themselves and their friends compensation and other amounts at the expense of the Company and its shareholders, the results of which caused damage to Plaintiffs.

97.     At the time of said misrepresentations and/or omissions, Plaintiffs and

other members of the class were ignorant of their falsity and reasonably believed them to be true. Had Plaintiffs known the truth regarding the foregoing, which was not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their FH stock, or, if they had acquired such stock, they would not have done so at the artificially inflated prices that they paid.

98.     By virtue of the foregoing, the Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's stock during the class period.

**COUNT II**
**Violation of § 20 of the Exchange Act**
**(against the Controlling Group Defendants)**

100.     Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

101.     The Controlling Group Defendants acted as controlling persons of FH within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Controlling Group Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend is false and misleading.  The Controlling Group Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.   In particular, members of the Controlling Group Defendants, including Perlman, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.   As set forth above, Bernstein, Abbe, Perlman, and Giardina violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Controlling Group Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's stock during the class Period.

### COUNT III
**Fraudulent Misrepresentation**
**(against all Defendants)**

104.   Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

105.   As set forth above, Defendants made representations to Plaintiffs in connection with the transactions described herein.

106.   The forgoing representations by Defendants were false, materially misleading, or otherwise omitted material facts at the time Defendants made them.

107.   Defendants knew or should have known of the falsity of the foregoing representations when they were made or otherwise acted recklessly with respect to the

truthfulness of the foregoing representations.

108.    Defendants made the foregoing representations intending Plaintiffs to believe the truth of such representations.

109.    Defendants made the foregoing false representations with actual intent to defraud Plaintiffs and to induce Plaintiffs to rely upon such representations.

110.    Defendants knew or should have known that material facts described in the representations, or otherwise omitted therefrom, were not readily available to Plaintiffs and that Plaintiffs would rely, and did rely, and act on Defendants' special knowledge concerning such facts.

111.    As a direct result of the foregoing fraud, deceit and misrepresentation by Defendants, Plaintiffs have suffered damages.

## COUNT IV
### Negligent Misrepresentation
### (against all Defendants)

112.    Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

113.    A special relationship arose between Plaintiffs and Defendants, as a result of the legal relationship, correspondence, discussions, and transactions between Plaintiffs and Defendants and as a result of Defendants superior knowledge concerning matters not disclosed to Plaintiffs concerning the merger transaction between FH and XpresSpa, including but not limited to the existence of a long-standing and close relationship between the members of the Controlling Group, the *quid pro quo* agreements between the Defendants concerning the merger transaction, and the fact that the terms of the merger agreement would result in Bernstein no longer qualifying as an independent member of the Board of Directors of FH.

114.    Plaintiffs were reasonably foreseeable recipients of the representations, disclosures and/or omissions therein concerning the merger transaction between FH and XpresSpa and the other transactions that are the subject of this action.

115.    Defendants owed to Plaintiffs a duty of reasonable care when making the foregoing representations, disclosures, and/or omissions, including but not limited to a duty of care with respect to representations and disclosures concerning the merger between XpresSpa and FH.

116.    Defendants owed to Plaintiffs a duty to disclose all facts material to the merger transaction.

117.    Plaintiffs justifiably relied on the representations, disclosures and/or lack thereof provided (or failed to be provided) by Defendants.

118.    Defendants knew or should have known that Plaintiffs would rely on Defendants representations, disclosures and/or lack thereof to Plaintiff.

119.    Defendants negligently provided false and/or materially misleading information and/or negligently failed to disclose information material to Plaintiffs' decision to vote with respect to the merger transaction.

120.    The negligent representations by Defendants constitute gross negligence.

121.    The false and/or materially misleading information provided or failed to be disclosed by Defendants proximately caused damage to Plaintiffs in an amount to be determined at trial.

**COUNT V**
**Expropriation**
**(against all Defendants)**

122.    Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein

at length.

123.     Bernstein, together with the other Controlling Group Defendants, including, specifically, Heyer, caused FH to price the number of shares to be received by the legacy XpresSpa shareholders in the merger at an artificially high value for FH. Specifically, in the proxy materials filed with the SEC. describing the merger, FH touted that its stock had traded at $3.24 on October 18, 2016 and that, as part of the merger, the legacy XpresSpa shareholders received 2,500,000 warrants at an exercise price of $3.00 per share. Upon information and belief, the price of FH's stock was artificially inflated in or about October 2016 by the Controlling Group or upon their direction. When the merger transaction closed on or about December 23, 2016, the FH shares were trading at $2.09 and the price of FH shares had not closed above $3.00 since October 2016. XpresSpa shareholders received only the same number of shares as if the price per share in FH was at the value estimated in August 2016 and stated in the October 2016 proxy statement. As a result, Plaintiffs received FH stock for "consideration of lesser value" and, "as a result, there is an increase in the controlling shareholder's percentage of ownership that corresponds to a decrease in the minority stockholders' percentage of ownership."

124.     Bernstein, Heyer, and the other Controlling Group Defendants were aware that the price set for the exchange of FH stock for shares of XpresSpa would have the effect of decreasing the relative percentage of ownership of the minority owners of XpresSpa, including Plaintiffs.

125.     The conduct of Bernstein, Heyer, and the other Controlling Group Defendants caused Plaintiffs to receive a decrease in percentage of ownership, which caused a decrease in their economic interest in the Company and a decrease in their voting power.

126.     Thus, Plaintiffs have suffered direct economic damages and equitable

harm as a direct and proximate result of the conduct of Bernstein, Heyer, and the other Controlling Group Defendants.

## COUNT VI
### Breach of Fiduciary Duty
### (against Heyer and Bernstein)

127.   Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

128.   As directors of XpresSpa, Heyer and Bernstein owed to Plaintiffs the fiduciary duties of loyalty, good faith, and due care.

129.   Heyer and Bernstein breached their fiduciary duties by failing to disclose the *quid pro quo* transaction between Heyer and the Controlling Group and FH in connection with the merger transaction and otherwise entering into undisclosed transactions for their own selfish purposes and at the expense of Plaintiffs.

130.   In contemplating, planning, and/or effecting the foregoing conduct, Heyer and Bernstein did not act in good faith and breached their fiduciary duties of loyalty, good faith, and due care.

131.   These actions were not a good faith exercise of business judgment to protect and promote the best interests of the members of XpresSpa, but rather lined the pockets of themselves at the expense of and to the detriment of Plaintiffs.

132.   As a direct and proximate result of these actions of Heyer and Bernstein, Plaintiffs have been and will be damaged.

## COUNT VII
### Unjust Enrichment
### (against all Defendants)

133.   Plaintiffs repeat, restate and re-allege each and every allegation contained

in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

134.    The Defendants have caused and will cause the Company to unjustly enrich Perlman, Bernstein, and Abbe at the expense of, and to the detriment of Plaintiffs.  The Defendants were unjustly enriched pursuant to receiving compensation and/or director remuneration while breaching their fiduciary duties to Plaintiffs.

135.    By reason of the foregoing, the Company was damaged.

**COUNT VIII**
**Breach of Fiduciary Duty of Candor in**
**Connection With the 2016 Proxy**
**(against all Defendants)**

136.    Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

137.     Defendants owed to Plaintiffs a fiduciary duty of candor with respect to disclosures made to the shareholders of the Company.  Pursuant to this duty, Defendants were duty bound to make accurate, truthful, and complete disclosures and statements about the affairs of the Company.

138.    By way of the foregoing, Defendants breached their duty of candor.

139.    As a result of the Defendants' breach of their duty of candor, Defendants are liable to the Company.

**COUNT IX**
**Aiding and Abetting**
**(against the Controlling Group Defendants and Heyer)**

140.    Plaintiffs repeat, restate and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein

at length.

141.    By way of the foregoing, the conduct of one or more of the Controlling Group Defendants and Heyer resulted in a violation of one or more of the securities laws.

142.    One or more of the members of the Controlling Group and Heyer provide substantial assistance in achievement of conduct that resulted in one or more violations of the securities laws.

143.    One or more of the members of the Controlling Group and Heyer knew or should have known or, or otherwise had the motive and opportunity, that their provision of substantial assistance would result in one or more violations of the securities laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, and in favor of Plaintiffs as follows:

**(a)**    Rescission of the transaction by which Plaintiffs exchanged their interest in XpresSpa for shares of FH;

**(b)**    Against all Defendants and in favor of Plaintiffs for the amount of damages sustained by Plaintiffs as a result of Defendants' malfeasance, plus pre-judgment interest and post-judgment interest;

**(c)**    Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the stock compensations awards described herein;

**(d)**    Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiffs' attorneys, experts, and accountants; and

**(e)**    Granting Plaintiffs such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated:  New York, New York
           November 6, 2017

FELICELLO & MELCHIONNA LLP

By:    */s/ Rosanne E. Felicello*
        Rosanne E. Felicello
1120 Avenue of the Americas
4th Floor
New York, NY  10036
(212) 626-2616
rosanne@felmel.com

- and -

Michael James Maloney
CKR LAW LLP
1330 Avenue of the Americas
14th Floor
New York, New York  10019
Tel. (212) 259-7300
mmaloney@ckrlaw.com

*Attorneys for Plaintiffs Moreton Binn and Marisol F, LLC*