UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORETON BINN and MARISOL F, LLC,

           Plaintiffs,

        v.

BRUCE T. BERNSTEIN, RICHARD K. ABBE,
ANDREW R. HEYER, DONALD E. STOUT,
SALVATORE GIARDINA, JOHN ENGELMAN,
ANDREW D. PERLMAN, and FORM
HOLDINGS CORP.,

           Defendants,

Civil Action No. 1:17-cv-08594-LLS

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs Moreton Binn and Marisol F, LLC (together with Mr. Binn, the "Plaintiffs"), by

their undersigned attorneys, as and for their second amended complaint against Bruce T. Bernstein,

Richard K. Abbe, Andrew R. Heyer, Salvatore Giardina, Donald E. Stout, John Engelman, Andrew

D. Perlman, and Form Holdings Corp. n/k/a XpresSpa Group, Inc. ("FH" or the "Company" and

together with all the foregoing defendants, the "Defendants"), allege upon information and belief

as follows:

## NATURE OF THE ACTION

      1.     By this action, Plaintiffs seek recovery from the Defendants for violations of the

Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange

Act"), and breach of contract for damages resulting from misrepresentations and omissions made

by Defendants in connection with the merger of XpresSpa Holdings, LLC ("Original XpresSpa")

into Defendant FH, a corporation whose shares are listed on The NASDAQ Capital Markets

("NASDAQ").

2.     Plaintiffs spent over twelve years and significant personal capital creating, establishing, and growing the first ever airport spa, "XpresSpa." Through Plaintiffs' efforts, by 2015 the company had grown into an international brand with about 50 locations around the world with annual revenues of approximately $40 million. The gravamen of this action is that Defendants misled Plaintiffs to agree to transfer the business they had built in exchange for shares in a public company that was essentially a shell with no genuine, ongoing business of its own.

3.     Defendants Bernstein, Abbe, Perlman, and Giardina (together, the "Controlling Group")—together with Defendant Heyer worked together as part of a deliberate and undisclosed scheme to take control of Defendant FH's board of directors and effect the merger with XpresSpa to enrich themselves at Plaintiffs' expense.  Defendants tricked Plaintiffs and the other original investors in the company by making various misrepresentations, half-truths, and otherwise omitting material facts from prospectuses, proxy statements, and other certain key disclosures, and employing manipulative devices, in order to convince Plaintiffs to transfer their interests in Original XpresSpa in exchange for shares in Defendant FH.

4.     In addition, Defendants overstated the value of the securities of Defendant FH offered as consideration for the merger.  The market price of the shares of Defendant FH proffered as consideration (valued by Defendants at approximately $35 million) was artificially inflated because of Defendants' failure to disclose the true nature of the relationship between the members of the Controlling Group and their concerted efforts to enrich themselves at the expense of Plaintiffs and other FH shareholders.

5.     Once Defendants began to disclose prior relationships between the Controlling Group members at other corporations, the market price of FH stock began to fall.

6.      Defendants continue to cause harm to Plaintiffs because they continue to hold and control a significant portion of the agreed consideration for the merger (in the form of preferred shares of stock) in escrow, nearly two years after the close of the merger. Defendants have taken improper charges against the escrow at Plaintiffs' expense. Thus, Defendants have not yet transferred the entirety of the consideration underlying the transaction and continue to engage in violations of the securities laws that diminish the value of that consideration.

7.      As detailed below, Defendants are liable to Plaintiffs for the damages they have caused as a result of violating the federal securities laws and breaching the terms of their contract with Plaintiffs. In this action, Plaintiffs seek rescission of the merger, compensatory damages, attorneys' fees, and all other just and proper relief.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted in this action.

9.      Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

### Plaintiffs

10.     Plaintiff Moreton Binn is an individual residing in Fairfield County, Connecticut. Mr. Binn is a shareholder of FH.

11.     Plaintiff Marisol F, LLC is a limited liability company organized and existing under the laws of the State of New York.  The principal offices of Marisol F, LLC are located at c/o Ahn Law Group LLC, 85 Broad Street, 16th Floor, New York, NY  10004.

12.     Marisol Binn is the sole member of Marisol F, LLC.  Marisol Binn is a resident of Fairfield County, Connecticut.  Marisol F, LLC is a shareholder of FH.

13.     Plaintiffs Moreton Binn and Marisol F, LLC obtained their shares in FH when Original XpresSpa was acquired by FH. As consideration for Original XpresSpa, FH transferred common shares, warrants for common shares, and preferred shares of FH stock (the "Consideration") to members of Original XpresSpa, including Plaintiffs. A substantial portion of the Consideration remains in escrow under the control of the Defendants and, thus, the sale of Original XpresSpa to FH remains ongoing.

**Individual Defendants**

14.     Defendant Bruce T. Bernstein is an individual and has been a director of FH since February 8, 2016 and a member of the compensation and audit committees of the board of directors of FH since February 8, 2016.  Bernstein also serves as a member of the nominating and corporate governance committee of FH.  Before the merger, Bernstein was a member of the board of directors of Original XpresSpa. Bernstein owns and/or controls Rockmore through which he controls the Rockmore Note and acts on behalf of the Controlling Group.

15.     Defendant Richard K. Abbe has been a director of FH since March 9, 2016.  Abbe owns and/or controls Iroquois Master Fund Ltd., an investment vehicle through which he acts on behalf of the Controlling Group. Abbe also owns or controls American Capital Management LLC. Through American Capital Management, LLC, Abbe holds an interest in the Rockmore Note the existence of which was concealed until after the merger.

16.     Defendant Salvatore Giardina is an individual and has been a director of FH since May 23, 2016 and a member of the audit committee of the board of directors since the same date. The Controlling Group has appointed Giardina to director positions in several public companies.

17.     Defendant Andrew D. Perlman is an individual and was a director of FH from September 2009 until he resigned on April 19, 2018. He also previously served as Chief Executive Officer of FH from approximately 2012 until April 2018.

18.     Defendant Andrew R. Heyer is an individual residing in Westchester County, New York.  Heyer has been a director of FH since December 23, 2016.  Heyer is the founder and CEO of Mistral.

19.     Defendant Donald E. Stout is an individual and has been a director of FH since July 19, 2012.  Stout served as a member of the compensation, audit, and nominating and corporate governance committees of the board of directors of FH.

20.     Defendant John Engelman is an individual and first became a director of FH since December 2010. In connection with the annual meeting of shareholders of FH held on September 18, 2018, Engelman declined to seek re-election as a director of FH.

### The Company

21.     Defendant FH is a corporation organized and existing under the laws of the State of Delaware. The principal offices of FH are located at 780 Third Avenue, 12th Floor, New York, NY 10017.

22.     Throughout the relevant period, the Company has been listed on NASDAQ.

23.     Prior to 2016, the Company was known as "Vringo, Inc." and engaged primarily in the business of monetizing patent portfolios through litigation, and before that, was engaged primarily in developing ringtones.

24.     From approximately 2012 until April 2018, Defendant Perlman served as the Chief Executive Officer of the Company.

25.     On January 5, 2018, the Company changed its legal name to "XpresSpa Group, Inc."

## FACTUAL BACKGROUND

### Original XpresSpa

26.     In and around 2003, Plaintiff Moreton Binn and his wife, Marisol Binn, founded the "XpresSpa" brand that ultimately became Original XpresSpa, a health and wellness business that operates spas located in airports. Plaintiffs started the XpresSpa business with in the first spa at an airport at JFK Airport – Terminal 1 and grew the business to about fifty locations around the world.

27.     Airport concessions are a competitive business, with just a few corporations holding leases on most of the available concession space. Further, there is a limited supply of airport terminal concession space suitable for the operation of retail spas.

28.     Initially, XpresSpa was the only airport spa business and the Binns made the deliberate decision to open spas as quickly as possible to establish the brand. In the process, they learned about airport concession leases and the need to acquire concession space when it is available or else the brand might be locked out of an entire market for 5 to 10 years.

29.     Thus, failing to invest the capital and time to obtain new locations as they become available can result in a long-term gain in revenue and market position to a competitor and, conversely, a long-lasting negative impact to the airport spa business that loses the bid.

30.     In order to grow its business, and avoid the loss of valuable airport concession locations to competitors, Original XpresSpa regularly re-invested its profits into the acquisition of new locations.

31.     Original XpresSpa also developed a team of professionals with the capability and experience to secure new spa locations in competitive bidding environments.

32.     By 2015, Original XpresSpa had successfully obtained rights to airport spa locations around the world.

**Original XpresSpa Secured a Merger Commitment
from Amiral Holdings SAS**

33.     In 2015, the board of Original XpresSpa was evaluating strategic transactions by which it could obtain a further investment of capital in order to continue the growth of its business.

34.     By October 2015, Original XpresSpa had entered into a binding letter of intent to merge with Amiral Holdings SAS ("Amiral"), the entity that owned and operated the competing brand of "be relax" airport spas.

35.     The letter of intent provided the essential terms of the merger, including the investment of approximately $11 million in capital. The terms also provided to Amiral a binding right-of-first-refusal along with a penalty if Original XpresSpa failed to proceed with the merger.

36.     Defendant Heyer executed the Amiral letter of intent on behalf of both Original XpresSpa and Mistral on October 5, 2015. The merger described in the letter of intent with Amiral required the approval of the board of directors of Original XpresSpa. Accordingly, Heyer presented the Amiral letter of intent to the board of Original XpresSpa.

37.     During the period relevant to this action, Defendants Bernstein, Heyer, and Plaintiff Moreton Binn, among others, were members of the board of directors of Original XpresSpa. Defendant Heyer directed the operations of Mistral Equity Partners (together with its affiliates,

"Mistral"), the majority member of Original XpresSpa. Defendant Bernstein, through an investment vehicle that he controlled named Rockmore Investment Master Fund Ltd. ("Rockmore"), had a substantial creditor relationship with XpresSpa by way of a senior secured note (the "Rockmore Note"). Plaintiffs Moreton Binn and Marisol F, LLC held voting rights and privileges with respect to Original XpresSpa.

### The Controlling Group

38.     Unbeknownst to Plaintiffs, however, Defendant Bernstein was one member of a group of individuals who worked closely together to obtain and exert control over publicly listed companies for their own selfish interests.

39.     In addition to Bernstein, this group included Abbe, Perlman, and Giardina (the "Controlling Group"). The Controlling Group has a history of operating similar schemes for the purpose of obtaining control over a public company for their own self-interest.

40.     Generally, the Controlling Group will first take a position in a target company by way of the acquisition of a substantial ownership of the target company's stock or by causing one of their investment vehicles to enter into a convertible debt facility or other debt financing on coercive terms.

41.     Following the initial investment, Abbe, Bernstein, or another member of their group, will then use their initial foothold position to cause other members of the Controlling Group to be appointed to the board of directors of the target company.  Once one member of the Controlling Group is appointed to a board, other members of the Controlling Group are quickly appointed to directorships until the group attains the power to control the affairs of the target company.

42.     Members of the group are then appointed to the Audit and Compensation Committees of the target company.  Once the Controlling Group has effected a change of control, they grant themselves valuable compensation and use the target company to refinance the initial investment on favorable terms.

43.     Members of the Controlling Group, acting through various investment vehicles, have implemented schemes to effect changes of control or other coordinated activities with respect to National Holdings Corporation ("NHC"),[1] Neurotrope, Inc. ("Neurotrope"), GeoResources, Inc., USA Technologies, Inc., and TapImmune, Inc.

44.     To effect these schemes, the Controlling Group has used various investment vehicles, such as Rockmore, controlled by Bernstein, and Iroquois[2] and American Capital Management, LLC, both investment vehicle controlled by Abbe.

---

[1]     For example, in 2014, Salvatore Giardina held a foothold directorship in NHC.  Abbe and a business partner from Iroquois sent a notice of intent to nominate a slate of three directors to stand for election at the upcoming annual meeting to the board of directors.  Following this notice, NHC agreed to an investor settlement agreement that, inter alia, caused Abbe to be appointed to the board of directors and the board to nominate Abbe's Iroquois business partner as a director. Upon the declination of one current director to stand for re-election and the resignation of another board member immediately following the annual meeting, the board of NHC formed a strategy committee to be comprised of six non-management members, including either Abbe or his Iroquois business partner, *inter alia*. Giardina, by way of his undisclosed arrangement with Abbe, remained on the board after the investor settlement agreement. Abbe and his business partner, as well as Giardina, then voted as directed by Abbe and another Iroquois partner, for the purpose of exercising control over the affairs of NHC. Immediately following the Annual Meeting in July 2014, the newly-formed Strategy Committee included Abbe, his Iroquois business partner, and Giardina.  In or about September 2016, Abbe and Giardina caused NHC to complete a tender offer by a subsidiary of Fortress Biotech, Inc., receiving a premium in exchange for their initial investment while diluting the existing shareholders of NHC.

[2]     Bernstein, and Abbe used similar means to effect a change of control of a public company named Neurotrope, Inc. ("Neurotrope"). Neurotrope is a startup biotechnology company that licenses its core technology from another entity. First, Abbe caused Iroquois to take a 9.99% beneficial interest in Neurotrope.  Then, in connection with a public offering disclosed in July 2016, Abbe caused Iroquois to commence litigation against Neurotrope.  Abbe agreed to settle the litigation in exchange for an increase in the size of the board of directors and the appointment of a fellow Iroquois partner to the board of directors of Neurotrope.  Shortly thereafter, the board was increased again and, on November 14, 2016, Bruce Bernstein was appointed as a director of that company. Pursuant to the undisclosed arrangement between Abbe and Bernstein, Bernstein was appointed as the Chairman of the Audit Committee and also a member of the Compensation Committee, Nominating ,and Corporate Governance Committees of the board. In short order, Perlman was also elected as a director and appointed to the Audit and Compensation Committees.  Bernstein, Perlman, and Abbe's fellow Iroquois partner all voted to award to themselves, and continue to receive, valuable shares of Neurotrope stock.

**The Controlling Group Effected a Change of Control**
**in the Company and the Merger in order to Further**
**Their Own Self-Interest**

45.     At the time Bernstein learned of the likelihood of a merger of Original XpresSpa

with Amiral, Original XpresSpa was paying to Rockmore approximately $60,000 per month

pursuant to the payment terms of the Rockmore Note. Moreover, the onerous terms and covenants

of the Rockmore Note provided to Bernstein substantial control rights and power over Original

XpresSpa.

46.     A merger of Original XpresSpa into Amiral would have resulted in the discharge

of the Rockmore Note and a termination of the revenue stream then being paid to Rockmore.

47.     Unbeknownst to Plaintiffs at that time, Abbe, through his investment vehicle,

AMC, held an undisclosed interest in the Rockmore Note. Therefore, Abbe was a beneficiary of

the stream of payments that Original XpresSpa paid to Rockmore every month.

48.     After learning that the board of Original XpresSpa had entered into a letter of intent

with Amiral, Bernstein, Abbe, and other members of the Controlling Group engaged in a scheme

to stop the merger with Amiral and instead force a merger of Original XpresSpa into a publicly

listed company under their control.

49.     At the time, Perlman was the Chief Executive Officer and a director of FH, which

was publicly listed, and whose patent monetization business had largely wound down.[3]

---

[3]     Beginning in or around August 2014, the FH's patent monetization business suffered several negative
outcomes.  For example, the United States Court of Appeals for the Federal Circuit reversed a district court
finding of patent infringement against Google and in favor of the Company. In subsequent proceedings, the
Supreme Court of the United States denied the Company's request for a writ of certiorari in the Google
matter. In January 2015, the People's Republic of China's National Development and Reform Commission
(NDRC) threatened the Company with criminal sanctions unless the Company resolved its ongoing,
worldwide patent disputes with ZTE. Following these events, it became clear to Perlman that the Company's
patent monetization business would no longer generate the returns it previously generated.

50.     With the winding down of its operating business, and no other operating assets of substantial value, FH was a device by which the Controlling Group could effect a scheme similar to the ones they had engaged in the past.

51.     In or around 2015, the Controlling Group decided to capitalize on the Company's distressed circumstances to effect a change in control of the Company and obtain control over Original XpresSpa, all for their own self-interests.

52.     First, the Controlling Group used Perlman's position at the Company to cause it to enter into a $12.5 million convertible debt financing with Iroquois, controlled by Abbe. At that time, Perlman knew or should have known that the Company would shortly settle its remaining patent monetization disputes in exchange for a cash payment. Indeed, less than six months later, in December 2015, the Company announced a settlement with ZTE Corp. for $21.5 million. The debt facility with Iroquois was otherwise unnecessary to the operation of the Company, but subjected the Company to certain covenants. The true purpose of the Iroquois debt facility was to provide the Controlling Group a foothold interest with which to exercise control over the Company.

53.     Once both Perlman and Abbe had secured this initial leverage over the Company, Abbe, Perlman, Bernstein, and Heyer began to negotiate a merger of Original XpresSpa into the Company.

54.     The basic terms of the merger would require the members of Original XpresSpa to exchange their membership interests in exchange for $2.5 million worth of common shares in FH, 494,792 shares of fully paid and nonassessable shares of Series D Convertible Preferred Stock, par value $0.01 per share, and warrants to purchase an aggregate of 2,500,000 shares of common stock with an exercise price of $3.00 per share (the "Merger Consideration"). The exact number of

common shares to be exchanged would be determined based on the price of the stock as of a date to be mutually agreed upon by Original XpresSpa and the Company.

55.     A significant portion of the Merger Consideration that Defendants offered to sell to Plaintiffs and other members of Original XpresSpa, however, would be held in escrow for up to eighteen months following the closing. Portions of this Merger Consideration would be released to the former members of Original XpresSpa over time, much like an installment sales contract.

56.     As part of the merger, the Controlling Group proposed that the Company could elect to pay-off the Rockmore Note after the closing but would otherwise assume the obligations of the Rockmore Note going forward.

57.     Following the acquisition, Bernstein would beneficially own a 4.7% interest in the Company and both he and Abbe would be appointed as a member of the board of directors. In secret, Bernstein and Abbe had no intention of ever paying off the Rockmore Note. The true purpose of transferring the obligations to the Company was to permit Bernstein and Abbe to use the terms of that note to exert undue control over the publicly listed Company.

58.     By way of their voting rights, Defendants would require both Plaintiff Moreton Binn and Heyer, in their capacities as directors of Original XpresSpa, to vote in favor of the merger.

59.     Once Heyer had agreed to the basic terms of a merger with the Company, Perlman and Abbe proceeded to use their influence over the Company to secure board positions for the remaining members of the Controlling Group. First, on February 8, 2016 they appointed Bernstein as a member of the board of directors and Chair of the Compensation Committee of the Company.

60.     In March 2016, Perlman and Bernstein caused the Company to appoint Abbe as a director. Following the appointment of Bernstein and Abbe to the board, the Defendants certified that Bernstein satisfied the criteria for independence required under the listing rules of NASDAQ.

61.     In May 2016, Perlman, Bernstein, and Abbe caused the Company to appoint Giardina as a director.  With the appointment of Giardina, the Controlling Group held a majority of seats on the board of directors of the Company.

62.     Bernstein and Heyer then disclosed to Plaintiff Moreton Binn the fact that they had been engaged in discussions with FH regarding merger and the general terms.

### Bernstein Declared a Default of the Rockmore Note in Bad Faith

63.     A merger of Original XpresSpa with the Company would result in a breach of the letter of intent with Amiral. In order to coerce the other members of the board of Original XpresSpa to proceed with a merger of the Company, and risk liability under the Amiral, Bernstein caused Rockmore, on June 7, 2016, to declare Original XpresSpa in default of the Rockmore Note.

64.     Original XpresSpa was not in payment default and, indeed, had always fulfilled its payment obligations under the Rockmore Note. Instead, the basis for the default orchestrated by Bernstein and Abbe related to the financial reporting covenants of the Rockmore Note. However, Bernstein had no good faith basis for the declaration of a default.

65.     The term of the Rockmore Note was one year. Yet the covenants of the Rockmore Note required Original XpresSpa to provide certified financial statements before the end of the term of the note. Because the term of the Rockmore Note expired in twelve months, the auditors preparing financial statements would necessarily conclude that the note would expire and the entire principal would become due during the next reporting year. Accordingly, Original XpresSpa's auditors would not provide certified financial statements unless Rockmore advised that it would renew the term of the note for an additional year, thereby avoiding the need to repay the note in full during the next reporting year.

66.     Until 2016, Bernstein and Abbe had always caused Rockmore to grant a renewal of the term as a matter of course and auditors of Original XpresSpa would issue certified financial statements.

67.     In 2016, however, Bernstein, Abbe, and the rest of the Control Group decided to use the circular aspect of the financial reporting covenant to coerce Original XpresSpa into a merger with the Company, regardless of the Amiral merger and the other options available to Original XpresSpa.

68.     In order to effect their plan, Bernstein caused Rockmore to withhold its consent to renewal of the term of the Rockmore Note. This caused Original XpresSpa's auditors to be unable to provide certified financial statements. Bernstein then caused Rockmore to declare an event of default.

69.     At first Heyer proposed that Original XpresSpa simply pay Rockmore an additional $500,000 in exchange for a further renewal of the term.

70.     Upon information and belief, the Control Group then offered Heyer a *quid pro quo*. In exchange for his support for the merger, the Control Group promised to grant to Heyer, individually, of additional shares of the Company following the merger and to grant Heyer's fund, Mistral, the opportunity to invest in the Company before the merger.

71.     Heyer agreed to this *quid pro quo*, and, on or about August 8, 2016, caused Mistral to invest $1,733,828 with FH. On or about the same date, FH used these funds to purchase 1,733,826 Series C Preferred Units of XpresSpa, providing XpresSpa with capital that became necessary following the declaration of an event of default by Rockmore.  Heyer could have caused Mistral to make this investment of funds directly in XpresSpa, but in light of the undisclosed *quid pro quo* agreement with the Controlling Group, investing this capital though FH served the interest

of the *quid pro quo* of the Controlling Group.  This transaction resulted in Mistral owning 750,574 common shares in FH. The price paid by Mistral was $2.31 per share, which is about 8% greater than the highest price paid for the stock that day on the open market.[4]

72.     Bernstein and Heyer then urged Plaintiff Moreton Binn, in his capacity as a member of the board of directors of Original XpresSpa, to vote in favor of a merger with FH regardless of the binding letter of intent with Amiral.

73.     At a meeting of the board of directors of Original XpresSpa, held on June 14, 2016, Bernstein advised Plaintiff Moreton Binn and other members of the board of directors of Original XpresSpa that Rockmore "may be willing to declare the notice of default cured if certain conditions are met, including (but perhaps not limited to) Rockmore becoming comfortable that the 'V' deal is firmly in place."  The "V deal" refers to "Vringo, Inc.," the former name of FH.

### Defendants had a Legal Duty to Make Disclosures Concerning the Merger that were Not Misleading

74.     In urging Plaintiff Moreton Binn to vote in favor of the merger with the Company, Heyer and Bernstein emphasized the fact that the Company's stock was listed on NASDAQ and the purported transparency and reporting that such a listing provided.

75.     By no later than August 5, 2016, Defendants Heyer and Bernstein shared with Plaintiff Moreton Binn copies of a draft merger agreement, in which the Company represented that "[a]s of their respective filing dates, the [Company's] SEC Documents (i) did not (or with respect to Parent SEC Documents filed after the date hereof, will not) contain any untrue statement of any material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not

---

[4]     On January 17, 2017, less than a month after the closing of the merger, Heyer did in fact receive his *quid pro quo* in the form of an option grant of 85,000 shares at an exercise price of $2.12, which vested quarterly over a one-year period with the initial quarter of shares vesting upon grant.

misleading and (ii) complied (or will comply) in all material respects with the applicable requirements of the Exchange Act or the Securities Act, as the case may be, the Sarbanes-Oxley Act and the applicable rules and regulations of the SEC under each of those statutes, rules, and regulations. . . ."

76.     Section 12 of the Securities Act prohibits the omission of material facts necessary to make statements in such a prospectus not misleading. More specifically, Section 12 provides that "Any person who-- . . . (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . shall be liable . . . to the person purchasing such security from him. . . ." 15 U.S.C. § 77*l*.

77.     The draft merger agreement, oral communications, and other communications by Defendant leading up to the vote by the board of directors of Original XpresSpa constituted a prospectus for purposes of the securities laws. Under the securities laws, by making statements in that prospectus, Defendants had an obligation to ensure that their statements were not misleading by the omission of material facts.

### Defendants Made False and Misleading
### Statements Concerning the Merger

*Defendants Made False and Misleading Statements and Omitted*
*Material Facts Concerning the Rockmore Note*

78.     Defendants violated their legal duties under the securities laws by making false and misleading statements concerning the merger. For example, Bernstein and Heyer made statements to the effect that the merger with the Company was Original XpresSpa's only option. These statements were false and misleading because not only did Original XpresSpa have available to it an existing opportunity to merge with Amiral, but Plaintiff Moreton Binn also introduced a viable

opportunity to go public through a special purpose acquisition company controlled by Icahn Associates, Inc.

79.     Bernstein told Plaintiff Moreton Binn that Rockmore could simply sell the Rockmore Note to the Company and the Company would obtain ownership over Original XpresSpa as a result of the default conditions of the Rockmore Note.

80.     This statement was misleading because it omitted the fact that Abbe at that time held both an interest in the Rockmore Note and a position on the board of the Company. Selling the note directly to the Company would not have been as beneficial for Bernstein and Abbe as an assignment of the obligations under note, which would put Bernstein and Abbe in the position of control over the Company that could then be used to obtain substantial monetary compensation and equity for Bernstein and Abbe.

81.     Moreover, Plaintiff Moreton Binn had substantial financial resources of his own, or access thereto, and offered to purchase the Rockmore Note himself.

82.     Bernstein's statements to Moreton Binn concerning a possible sale of the Rockmore Note were merely half-truths told to coerce Mr. Binn to vote in favor of the merger.

*Defendants Made False and Misleading Statements and Omitted*
*Material Facts Concerning the Independence of the Defendants*

83.     In its S.E.C. filings in early 2016, the Company disclosed that the Controlling Group were members of its board of directors. The Company also represented that the composition of its board of directors including the members of the Controlling Group satisfied all requirements for independence under applicable law and the NASDAQ listing rules.

84.     The Sarbanes-Oxley Act of 2002 provides for requirements as to the independence of members of the audit committee of publicly-listed companies. More specifically, 15 U.S.C. § 78j-1(m)(3) provides that "(A) . . . Each member of the audit committee of the issuer shall be a

member of the board of directors of the issuer, and shall otherwise be independent. (B) . . . In order to be considered to be independent for purposes of this paragraph, a member of an audit committee of an issuer may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee-- (i) accept any consulting, advisory, or other compensatory fee from the issuer; or (ii) be an affiliated person of the issuer or any subsidiary thereof."

85.     17 CFR § 240.10a-3 provides that "(ii) . . . In order to be considered to be independent for purposes of this paragraph (b)(1), a member of an audit committee of a listed issuer that is not an investment company may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee: (A) Accept directly or indirectly any consulting, advisory, or other compensatory fee from the issuer or any subsidiary thereof, provided that, unless the rules of the national securities exchange or national securities association provide otherwise, compensatory fees do not include the receipt of fixed amounts of compensation under a retirement plan (including deferred compensation) for prior service with the listed issuer (provided that such compensation is not contingent in any way on continued service); or (B) Be an affiliated person of the issuer or any subsidiary thereof."

86.     17 C.F.R. § 230.405 defines "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified." and "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.  .

87.     Issuers listed on NASDAQ are required to comply with rules set forth by NASDAQ. Rule 5605(a)(2) of the NASDAQ Stock Market Rules defines "independent director"

as "a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."

88.     Rule IM-5605 of the NASDAQ Stock Market provides that "[i]t is important for investors to have confidence that individuals serving as Independent Directors do not have a relationship with the listed Company that would impair their independence. The board has a responsibility to make an affirmative determination that no such relationships exist through the application of Rule 5605(a)(2)."

89.     Defendants' statements concerning the composition of the board and its independence leading up to the vote by the board of Original XpresSpa were misleading because they stated or otherwise suggested that a board including Bernstein, Abbe, Perlman, and Giardina would continue to satisfy requirements for independence following the merger.

90.     Following the merger, the Company's board would not qualify as independent because, *inter alia*, by way of the merger the Company would assume the obligations under the Rockmore Note, which Bernstein would still control and in which Abbe would continue to hold an economic interest.

91.     As mentioned above, Bernstein also represented that the Rockmore Note would be paid off in full shortly following the contemplated merger. This statement was false because the Controlling Group secretly intended not to pay off this obligation and, instead, to use it to exert undue control over the publicly listed Company.

92.     Defendants also failed to disclose and omitted material facts concerning their numerous and overlapping business relationships. Specifically, Defendants failed to disclose that Abbe's investment company, Iroquois, filed a lawsuit against NHC at the time that Giardina was

a member of the board and chairman of the NHC's audit committee. Despite significant changes to the board of NHC as part of the settlement of the lawsuit, including the appointment of Abbe and his then-investment partner to NHC's board, Giardina remained on the Board and Chairman of the Audit Committee after Iroquois's investment and litigation.

93.     Similarly, Defendants failed to disclose in any of the filings with the SEC prior to the close of the merger that Bernstein had been appointed to the board of directors of Neurotrope, at the direction of Abbe, as of November 14, 2016.  Bernstein's appointment to the Neurotrope board at the direction of Abbe was a *quid pro quo* for Bernstein's assistance in facilitating the merger with FH.

94.     These undisclosed business relationships between the directors belie the claims of director independence made by Perlman and the other members of the Controlling Group in FH's prospectuses, proxy statements, and other statements.

95.     By disseminating prospectuses and proxy statements, Perlman and the other members of the Controlling Group had a duty to disclose fully in those materials these additional business relationships between FH's directors.

96.     Long after the closing of the merger, Defendants amended the Company's 10-K to include information about Perlman and Bernstein's board membership at Neurotrope. This amendment further demonstrates the materiality of such information and that omission of such information constitutes a violation of the securities laws.

### Plaintiffs Relied Upon the Truthfulness and Completeness of Defendants' Statements in Voting in Favor of the Merger

97.     In preparing for a vote by the board of directors of Original XpresSpa, Plaintiffs considered the oral and written statements made by Bernstein and Heyer and the other Defendants concerning Rockmore's willingness to waive the default upon a merger with the Company, the

promise that following the merger the Company would pay-off the Rockmore Note, that the merger with the Company was more favorable than the merger with Amiral, and the other misrepresentations described above.

98.     Plaintiffs also considered and relied on the representations concerning the Company's compliance with the securities laws and requirements, the purported transparency accompanying the Company's public listing on NASDAQ, and the statements made in the Company's S.E.C. filings.

99.     Otherwise, Heyer substantially prevented Plaintiffs from participating in meetings concerning the merger or otherwise obtaining for themselves information concerning the merger except by way of the representations described above. Accordingly, Plaintiff Moreton Binn relied on the representations made to him by Defendants, when he voted, in his capacity as a member of the board of directors of Original XpresSpa, in favor of the merger.

100.     On August 8, 2016, the Company entered into the merger agreement with Original XpresSpa and filed with the SEC a prospectus disclosing the terms of the agreement and an investor presentation. In the prospectus, the Company stated that the proposed post-merger board of directors would include the Controlling Group and also Defendants Heyer, Engelman, and Stout.

101.     At or around the same time, Bernstein and Heyer caused Original XpresSpa to amend its operating agreement to add the Company as a member. The amendment also provided to the Company effective control over any strategic decisions concerning Original XpresSpa. By these actions, Defendants had obtained effective control over both the Company and Original XpresSpa.

102.    Defendants then began to use this control to mold the terms of the merger to serve their own selfish interests. For example, they amended the merger agreement to increase substantially the proportion of the Merger Consideration to be held in escrow by an additional $2 million, thereby placing more of the Merger Consideration under their control during the escrow period that would follow the merger. The Defendants ultimately intended to charge inflated costs and expenses against this Merger Consideration, thereby depriving Plaintiffs of the securities offered to them in connection with the merger.

### Defendants Made Further Misrepresentations and Omissions in Proxy Statements and Prospectuses in Order to Induce Plaintiffs to Execute the Joinder Agreements

103.    Between September 9, 2016 through October 28, 2016, the Company filed with the S.E.C. various prospectuses, statements, disclosures, and proxy statements concerning the merger. Among these materials were forms of joinder agreements whereby the members of Original XpresSpa, such as Plaintiffs, would join the merger agreement as parties. One purpose of the proxy statements and other materials was to solicit Plaintiffs to execute the joinder agreements.

104.    Pursuant to Section 12 of the Securities Act, and regulations promulgated thereunder, Defendants had a legal duty not to make any statements in their prospectuses that would be misleading by way of the omission of material facts.

105.    Section 14 of the Exchange Act prohibits the omission from proxy statements of material facts necessary to make such a proxy statement not misleading. 17 CFR § 240.14a-9(a), promulgated pursuant to Section 14 of the Exchange Act, prohibits solicitation by means of a proxy statement containing "any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 CFR § 240.14a-9(a).

106.    Accordingly, by making disclosures in proxy statements and disseminating those materials to Plaintiffs, Defendants had a legal duty to ensure that they were not telling half-truths that would mislead Plaintiffs by omitting material facts necessary to make such statements not misleading.

107.    In a Form S-4 proxy statement filed by the Company on September 9, 2016, Defendants disclosed that the Controlling Group had an interest in continuing to serve as members of the board of directors following the merger and that Bernstein had a controlling interest in the Rockmore Note.

108.    Defendants failed to disclose in the Form S-4 that Abbe held an interest in the Rockmore Note and that by way of their control over and interest in the Rockmore Note, Bernstein and Abbe would have undue control over the operations of the Company. Nonetheless, Defendants represented that "[t]he FORM board of directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and in recommending that FORM stockholders approve the FORM Merger Proposal. . . ."

109.    In an amended form S-4 proxy statement filed with the SEC on October 26, 2016, Defendants represented that "Following the completion of the Merger, FORM is initially expected to have a seven member board of directors, comprised of Andrew D. Perlman, John Engelman, Donald E. Stout, Salvatore Giardina, Bruce T. Bernstein and Richard J. Abbe, all of whom are currently members of the FORM board of directors, and Andrew R. Heyer, who is currently a member of the XpresSpa board of directors. Each of John Engelman, Donald E. Stout, Salvatore Giardina, Bruce T. Bernstein, Andrew R. Heyer, and Richard K. Abbe will be deemed 'independent' in accordance with the standards set by [NASDAQ]. Each of Messrs. Engelman, Stout, Giardina, Bernstein and Abbe will also be deemed 'independent' in accordance with Rule

10A-3 promulgated under the Securities Exchange Act of 1934, as amended, or the Exchange Act. Accordingly, the board of directors of FORM will be comprised of a majority of independent directors as required by [NASDAQ]. . . .”

110.    The foregoing statements were false and misleading because of, *inter alia*, the omission of facts disclosing Abbe's interest in the Rockmore Note, the undue control that Bernstein and Abbe would have over the Company, the existence of the Controlling Group, and the Controlling Groups' history of using debt facilities to exert undue control over publicly listed companies.

111.    In their proxy statements and other materials, Defendants also represented that "the terms of the [Rockmore Note] were reflective of market rates as of the time of issuance. . . ." This statement was false and materially misleading because the terms of the Rockmore Note are onerous on their face.

112.    Specifically, the Rockmore Note, as amended, provides for base monthly interest, ranging from 8.5% to 10%, depending on whether the maturity date of the loan is extended to May 2019, plus accrued monthly interest of 2% annual interest, calculated on a monthly basis. According to the Company's public filings prior to the completion of the merger, the Rockmore Note accrues interest of 9.24% per annum, payable monthly, plus an additional 2.0% per annum, and matures on May 1, 2019, with an additional one-year extension if both the Company and Rockmore consent to such extension.

113.    On their face, these terms are not reflective of market terms. Accordingly, Defendants' representations concerning the terms of the Rockmore Note were misleading.

114.    The proxy statements described how, as consideration for the merger, Plaintiffs and the other legacy members of Original XpresSpa would receive Merger Consideration comprising common stock warrants, convertible preferred stock and common stock of the Company.

115.    To establish the market value of the Merger Consideration, the Controlling Group delivered to the legacy shareholders an appraisal prepared at Defendants' request. This appraisal purported to value the Merger Consideration at $35,160,098.

116.    This valuation of the Merger Consideration was false and misleading because Defendants had inflated the value of the remaining patent monetization assets on the books of the Company knowing and intending to liquidate those assets for much less soon after the merger.

117.    Likewise, Defendants also caused the valuation to be inflated by inflating the amount of cash assets held by the Company and represented that such cash would be available for investment into growing the airport spa business following the merger. Defendants secretly intended to distribute any substantial cash before the closing of the merger and knew that substantially none of the promised cash used to value of the Merger Consideration would actually be available for investment in the operating spa business following the merger.

### Plaintiffs Relied on the Truthfulness and Completeness of Defendants' Proxy Statements and Prospectuses in Executing the Joinder Agreements

118.    Defendants caused the foregoing prospectuses, proxy statements, and other materials to be distributed to Plaintiffs and other members of Original XpresSpa to induce them to execute joinder agreements in connection with the merger.

119.    As described in the proxy statements and other materials, the Merger Consideration would be held in escrow for a period of eighteen months following the closing of the merger. During this post-merger escrow period, the Merger Consideration would be controlled by Heyer, through a Mistral affiliate.

120.     The joinder agreements included broad releases of not only the Defendants[5] but also the affiliate of Heyer that was designated to maintain the Merger Consideration in escrow following the merger. The joinder agreements also provide to Heyer's affiliate extensive rights over the Merger Consideration.

121.     Thus, during the escrow period Plaintiffs would necessarily be relying upon the good faith of both Heyer and the independence of the post-merger board of directors of the Company to maintain and preserve the value of the Merger Consideration during the escrow period.

122.     As described above, however, Defendants' representations as to the independence of the board of the Company following the merger were not true.  By way of the Company's assumption of the onerous Rockmore Note covenants and Bernstein and Abbe's respective stock ownership, neither Bernstein nor Abbe would qualify as an independent director of FH.

123.     Using the coercive power of the Rockmore Note and directorship positions, Bernstein, along with Abbe, directed the efforts of the Controlling Group. The other members of the Controlling Group lacked independence by way of their membership and participation in the Controlling Group and concerted efforts to further its goals.

124.     Moreover, Defendants' proxy statements failed to disclose and concealed that, in order to induce Perlman and Heyer to bring the merger to a closing, Bernstein and Abbe entered into undisclosed *quid pro quo* agreements to grant to those individuals additional equity compensation, not disclosed in the proxy statements, after the closing of the merger. These *quid pro quo* agreements were not disclosed in the proxy statements and concealed from Plaintiffs.

---

[5]      Pursuant to 15 U.S.C. § 78cc, that portion of the joinder agreement purporting to release the Defendants from liabilities under the securities laws are void.

125.     In exchange for his cooperation in furthering the scheme, the Controlling Group, with the specific assistance of Bernstein as Chair of the Compensation Committee and Stout as a member of the Compensation Committee, agreed to amend the executive compensation of the Company to authorize the Compensation Committee to grant the maximum amount of equity compensation permitted and to grant to Perlman, after the merger, a *quid pro quo* in the form of the maximum amount of equity compensation allowable under the Company's newly amended executive compensation plan and, also, to appoint Perlman to the Board of Neurotrope,[6] another public company controlled by Abbe and Bernstein.

126.     Once the *quid pro quos* were in place, Heyer took steps to prevent Plaintiffs from learning about the undisclosed arrangements and the Controlling Group's intentions. Heyer told Plaintiffs, along with others at Original XpresSpa, that he would be the one voice from Original XpresSpa permitted to participate in the negotiation of the merger so as to be sure that there were no inconsistent communications. This statement was false and misleading because Heyer failed to disclose the *quid pro quo* arrangements to which he had agreed, and his true intention was to conceal the truth from Plaintiffs.

127.     In considering whether to vote in favor of the merger and whether to execute the joinder agreements, Plaintiffs relied on the prospectuses, proxy statements, and other communications provided by Defendants, Plaintiffs were unaware that Heyer was purposefully blocking them from interacting with anyone at the Company in order to conceal the truth from Plaintiffs.

128.     During the relevant period, the individual Defendants Engelman and Stout acted as directors of the Company and, in that capacity, signed reports, proxy statements, and other

---

[6]     On June 19, 2018, Perlman resigned from Neurotrope's board of directors, causing Neurotrope to fail to satisfy a continued listing rule or standard of NASDAQ.

materials filed with the SEC.  As such, they had a duty to obtain knowledge of the truth and accuracy of the disclosures made in materials filed with the SEC before signing or authorizing the filing of such materials.  Engelman and Stout misrepresented, by omission or otherwise, the true nature of the relationship between the Controlling Group by deliberately refraining from taking those steps necessary to discover whether statements by the Controlling Group and the Company were false or misleading. In addition, Stout, as a member of the Compensation Committee did not take any steps to prevent the *quid pro quo* compensation paid to Heyer.

129.    In reliance on the truthfulness and completeness of the statements made by Defendants, Plaintiffs executed joinder agreements in connection with the merger.

## Loss Causation

130.    Had Plaintiffs known of the facts omitted from Defendants' prospectuses, proxy statements, and oral communications, Plaintiffs would have voted in opposition to the merger, taken action to prevent the merger, not executed the joinder agreements, or otherwise sought to dispose of their interest by other means, including by advancing the already agreed upon merger with Amiral.

131.    Had the Defendants disclosed the complete truth regarding their lack of independence and the other material facts described above, the Merger Consideration would have been appraised at near zero or a value substantially lower value than represented to Plaintiffs. The merger would not have closed, because the shares of common and preferred stock delivered as the merger consideration were tainted by undisclosed control and influence of the Controlling Group.

132.    When discussing the merger, Defendants misrepresented the Company as a going concern with multiple business interests, revenues, and capital that could be used to grow the XpresSpa business. But Defendants knew or should have known that they would soon be exiting

the remaining other businesses, were losing money each quarter, and would not have significant cash to invest in XpresSpa without a further capital raise. In short, FH had no intrinsic or ongoing value.

133.    If the Defendants representations about the going concern of the Company and its resources were truthful and complete, the price of the stock would have approximately doubled upon the closing of the merger in December 2016, thereby causing the warrants exchanged as part of the Merger Consideration to be in the money. This did not happen and the stock price actually fell because Defendants' representations concerning the assets of the Company were false.

134.    The Defendants' misrepresentations and omissions resulted in the exchange of the Merger Consideration at prices that were artificially inflated, causing substantial losses to Plaintiffs.

135.    Moreover, had Plaintiffs not executed the joinder agreement, their interests in Original XpresSpa would have been exchanged for a portion of the Merger Consideration and held in escrow, by way of the terms of the then operative operating agreement of Original XpresSpa but Plaintiffs would have retained valuable legal rights otherwise released by way of the terms of the joinder agreement. By executing the joinder agreement, Plaintiffs were damaged by, *inter alia*, releasing valuable legal rights vis-à-vis the escrow agent designated to hold Plaintiffs' share of the Merger Consideration during the escrow period.

**Defendants Post-Merger Conduct Continue
to Cause Losses to Plaintiffs**

136.    After the merger, the Controlling Group used their undue control and power over the Company to operate the business for their own selfish interests and otherwise engage in

conduct that a truly independent board would not have taken, all to the detriment of the underlying operating business, the stock price, and Plaintiffs.

137.    During the years before the merger, Plaintiffs had assembled a team of 32 experienced staff that had played an important role in growing the business of Original XpresSpa over the years. These staff had valuable experience in the successful bidding and build-out of important airport spa locations.

138.    Nonetheless, following the merger, the Controlling Group fired these professionals, thereby hobbling the Company's ability to successfully bid for and build-out airport spa locations. Since these terminations, the Company has lost several valuable locations to its competitor, Amiral. Substantially all of the locations opened after the merger were the result of work performed before the merger by Original XpresSpa's team of experienced staff.

139.    The Controlling Group has also fired experienced managers of spa locations.

140.    The squandering of this experience and capabilities has resulted in losses to competitors of valuable airport concession locations and has negatively impacted the long-term success of the Company and its share price.

141.    At the same time the Controlling Group was terminating the Company's experienced staff, the Controlling Group awarded themselves the maximum compensation permitted under the Company's amended executive compensation plan and increased the compensation of their acolytes at the Company in addition to granting to themselves below market pricing on equity offerings.

142.    Knowing that, by way of the Rockmore Note, they had full control over and security in the operating assets of the Company, the Controlling Group caused the majority of the Merger

Consideration to be diluted in value and otherwise improperly allocated against expenses of the Company.

143.    The post-merger equity offerings and grants substantially diluted Plaintiffs' interests and the consideration for the merger. Yet Bernstein and Abbe have used their undue control over the Company to maintain substantially the same equity positions they held immediately after the merger.

144.    As of the date the Merger Consideration was priced, the stock price was approximately $2.30.

145.    As information concerning the Controlling Group's prior relationships, including disclosures in May 2017 that Giardina previously held a board position at NHC and Bernstein's role on the board of Neurotrope, and the Company's need for additional capital for operations, disclosed on July 26, 2017, the stock price began to drop steadily.

146.    As of November 16, 2018, the stock price is $0.19.

147.    The Controlling Group also used the escrow of the Merger Consideration as a manipulative device to deprive Plaintiffs of the benefit of the bargain offered to them in the Company's prospectuses, proxy statements, and other communications.

148.    For example, at the same time that the Controlling Group was scheming to take over control and effect the merger, they knew that proceeding with a merger with the Company instead of Amiral would necessarily result in a breach of Amiral's right-of-first-refusal. Yet following the merger, the same Controlling Group that caused the beach of the obligation to Amiral, and the resulting damages claim, then proceeded to charge the entire amount of those damages to be assessed only against Merger Consideration held in escrow for Plaintiffs and the other former members of Original XpresSpa.

149.    Significantly, as a result of the escrow arrangement orchestrated by Defendants, over 30% of the consideration offered to Plaintiffs in connection with the merger, continues to remain in escrow under Defendants' control.

150.    Defendants have continued to engage in conduct that diminishes the value of the Merger Consideration or otherwise deprives Plaintiffs of the benefit of the bargain offered to them, in violation of the securities laws.

**Scienter**

151.    As detailed above, Defendants had both the motive and opportunity to make the foregoing fraudulent misrepresentations and commit violations of the securities laws. The Defendants who were on the board of the Company prior to the merger were motivated to move forward with the merger because the Company did not have a business likely to generate significant cash revenue after the settlement with ZTE in December 2015. In addition, the other Defendants had the opportunity presented to them by Abbe and Bernstein.

152.    Bernstein was motivated to move forward with the merger because it provided him with an opportunity to use the Rockmore Note, which, in fact, does not include his own funds, to gain significant influence at a public company (the Company) and to extract unwarranted monetary compensation and stock options.

153.    Abbe was similarly motivated to move forward with the merger because it allowed him to see his investment in the Rockmore Note transferred to being a liability of a public company and provided him with the opportunity to receive unwarranted monetary compensation and stock options.

154.    As detailed above, there is strong circumstantial evidence of *quid pro quo* arrangements provided to Heyer, Perlman, and Bernstein to entice them to move forward with the merger pursuant to terms that were detrimental to Plaintiffs.

## COUNT I
### Violation of § 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder (against all Defendants)

155.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

156.    Beginning in December 2015 and continuing today, Defendants have carried out a plan, scheme, and course of conduct, which was intended to, and did: (i) deceive Plaintiffs, as alleged herein; and (ii) cause Plaintiffs to purchase FH stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the individual Defendants took the actions set forth herein, including but not limited to obtaining and circulating an inaccurate and misleading alleged valuation of the purchase consideration and passing it off as a valuation of the XpresSpa business; limiting Plaintiffs ability to obtain outside legal advice concerning the transaction; failing to provide complete documents setting forth the rights and obligations of the parties concerning the merger, including the Joinder Agreement, prior to obtaining executed signature pages for those agreements; Bernstein's use of the Rockmore Note as leverage to convince Plaintiffs and the remaining Board Members of XpresSpa to vote in favor of the merger with FH; Bernstein and Perlman's promise to Heyer of a quid pro quo  of additional options in FH awarded after the close of the XpresSpa/FH merger; and the FH board of directors' failure to disclose Abbe's financial interest in the Rockmore Note..

157.    As specifically detailed herein, Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material

facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to benefit Defendants at the expense of shareholders and the Company, in violation of §10(b) of the Exchange Act and Rule 10b-5.

158.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the lack of independence of Bernstein and Abbe, the *quid pro qu*o provided to Heyer, and the prior relationships between the Controlling Group and their investment vehicles, as alleged herein.

159.   Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the benefits of the merger with XpresSpa, Bernstein's purported independence, and the lock-up period of the offering.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the foregoing not misleading.  As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from the investing public.  Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

160.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Defendants awarded to themselves and their acolytes compensation and other amounts at the expense of the Company and its shareholders, the results of which caused damage to Plaintiffs.

161.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the class were ignorant of their falsity and reasonably believed them to be true.

162.    Had Plaintiffs known the truth regarding the foregoing, which was not disclosed by Defendants, Plaintiffs would not have purchased or otherwise acquired their FH stock, or, if they had acquired such stock, they would not have done so at the artificially inflated prices that they paid.

163.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's stock.

<u>**COUNT II**</u>
**Violation of § 20 of the Exchange Act**
**(against the Controlling Group Defendants)**

165.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

166.    The Controlling Group Defendants acted as controlling persons of FH within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations,

and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Controlling Group Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend is false and misleading. The Controlling Group Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

167.    In particular, members of the Controlling Group Defendants, including Perlman, had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

168.    As set forth above, Bernstein, Abbe, Perlman, and Giardina violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Controlling Group Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's stock during the class Period.

**COUNT III**
**Violation of § 12(2) of the Securities Act**
**(against the Company and the Controlling Group Defendants)**

169.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

170.     As described in detail above, the Controlling Defendants formed a group of shareholders with aligned interests and for the purpose of exercising undue control over XpresSpa and the Series D preferred shares held in escrow to the detriment of Plaintiffs interest.

171.     As described above, the Controlling Defendants caused to be filed proxy statements, prospectuses, and other documents in connection with the sale of securities to Plaintiffs.

172.     The Controlling Group Defendants misrepresented and/or omitted to disclose facts necessary to make their statements not misleading in violation of Section 12(2).

173.     Plaintiffs relied on the Controlling Group Defendants to comply with the securities laws and to make any required filings necessary to provide them with adequate disclosure and transparency concerning their proposed investment in XpresSpa.

174.     As a result, the Controlling Group's violations of Section 12(2) of the Securities Act, Plaintiffs have suffered harm and damages.

**COUNT IV**
**Breach of Contract**
**(against the Company)**

175.     Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

176.     As set forth above, the Merger Agreement and related instruments constitute a binding and enforceable contract between Plaintiffs and the Company.

177.     Defendants made representations to Plaintiffs in the Merger Agreement and related instruments. The forgoing representations by Defendants were false, materially misleading, or otherwise omitted material facts at the time Defendants made them.

178.    The foregoing misrepresentations constitute material breaches of the Merger Agreement.

179.    By way of the foregoing breaches of the Merger Agreement, Plaintiffs have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, and in favor of Plaintiffs as follows:

**(a)**    Awarding to Plaintiffs damages in an amount to be determined at trial;

**(b)**    Rescission of the merger or the monetary equivalent of rescission;

**(c)**    Consequential damages;

**(d)**    Disgorgement;

**(e)**    Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the stock compensations awards described herein;

**(f)**    Equitable subordination of all secured debt currently owned or controlled by Bernstein and Abbe.

**(g)**    Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiffs' attorneys, experts, and accountants; and

**(h)**    Awarding to Plaintiffs pre-judgment interest, post-judgment interest, and attorney's fees;

**(i)**    Granting Plaintiffs such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: New York, New York                    CKR LAW LLP
       November 16, 2018

                                         By:    *Michael James Maloney*
                                             Rosanne E. Felicello

Michael James Maloney
1330 Avenue of the Americas
14th Floor
New York, New York 10019
Tel. (212) 259-7300
rfelicello@ckrlaw.com
mmaloney@ckrlaw.com

*Attorneys for Plaintiffs Moreton Binn and Marisol F, LLC*