UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**MORETON BINN and MARISOL F, LLC,**

Plaintiffs,

- against -

**BRUCE T. BERNSTEIN, RICHARD K. ABBE,**
**ANDREW D. PERLMAN, SALVATORE GIARDINA,**
**ANDREW R. HEYER, DONALD E. STOUT, JOHN**
**ENGELMAN, and FORM HOLDINGS CORP.,**

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   5/21/19

17 Civ. 8594 (LLS)

**OPINION & ORDER**

Plaintiffs Moreton Binn and Marisol F, LLC allege

violations of the Securities Act of 1933 and Securities Exchange

Act of 1934 and breach of contract in connection with the merger

of XpresSpa Holdings, LLC with Defendant Form Holdings Corp.,

which is now known as XpresSpa Group, Inc.

Defendants move for summary judgment, and Plaintiffs cross-

move for partial summary judgment.

For the reasons that follow, Defendants' motion is granted,

and Plaintiffs' motion is denied.

## BACKGROUND

### The Parties

XpresSpa Holdings, LLC ("XpresSpa Holdings") is a retailer

of spa services and related products. Plaintiff Moreton Binn is

a co-founder and former CEO and board member of XpresSpa

Holdings. Plaintiff Marisol F, LLC is a limited liability

-1-

company whose sole member is Marisol Binn, who is a co-founder and former president of XpresSpa Holdings.

Defendant Form Holdings was "a diversified holding company focused on acquiring and developing small to mid-market companies with growth potential." After its merger with and acquisition of XpresSpa Holdings, Form Holdings changed its name to XpresSpa Group, Inc. ("XpresSpa Group"). Plaintiffs are shareholders of XpresSpa Group.

The individual defendants are on XpresSpa Group's Board of Directors, except that Mr. Perlman resigned from the Board as of April 19, 2018. Mr. Perlman also served as XpresSpa Group's CEO until April 19, 2018. Mr. Bernstein is the Chairman of XpresSpa Group's Board. Before the merger, Mr. Bernstein and Mr. Heyer were on XpresSpa Holdings' Board of Directors.

### Before the Merger

In or around October of 2014, XpresSpa Holdings hired North Point Advisors to either raise capital for the business or sell it to a strategic buyer.

In 2015 and 2016, Mistral Spa Holdings, LLC, of which Mr. Heyer was the CEO and a director, invested a total of $10 million in XpresSpa Holdings in exchange for Series A and B membership units.

On April 22, 2015, XpresSpa Holdings approved a credit agreement with Rockmore Investment Master Fund Ltd.

-2-

("Rockmore"), an investment entity controlled by Mr. Bernstein, which gave XpresSpa Holdings a $6 million credit facility ("Rockmore Note") at an interest rate of 12% per annum. The resolution approving the credit agreement was passed unanimously with the Binns' approval and signatures, and Mrs. Binn executed the credit agreement as president of XpresSpa Holdings.

In October of 2015, XpresSpa Holdings considered a merger with its largest competitor, BeRelax, owned by Amiral Holdings SAS ("Amiral").

On April 28, 2016, during an XpresSpa Holdings members meeting, Mr. Heyer stated that the XpresSpa Holdings Board had also entered into merger discussions with two other interested parties: a private company called Steiner Leisure and a publicly-traded company, Form Holdings, which Mr. Heyer described as a "public shell" with "no operating business." At a later members meeting on May 18, 2016, one of XpresSpa Holdings' directors, William Phoenix, explained that XpresSpa Holdings was not comfortable with BeRelax management's ability to double XpresSpa Holdings' store count and maintain its level of sophistication, that the Steiner Leisure offer was "unpalatable from an economic standpoint," and that consequently, XpresSpa Holdings had entered into a letter of intent with Form Holdings, which would acquire XpresSpa Holdings for Form Holdings stock hypothetically valued at $35 million.

-3-

### The Merger

As of June 14, 2016, XpresSpa Holdings was in need of an immediate infusion of $2 million. At a Board meeting on July 19, 2016 Mr. Phoenix "noted that the company has urgent needs for funds . . . ." On July 20, 2016, the XpresSpa Holdings Board voted in favor of entering into a term sheet with Form Holdings.

On August 5, 2016, at an XpresSpa Holdings Board meeting held to vote on the merger with Form Holdings, its CEO Edward Jankowski stated that the company was nearly out of money and if the Board failed to approve the merger, the company would likely shut down in the near future and file for bankruptcy. The vote was delayed two days because Mr. Binn was concerned about the merger's effect on his personal tax situation and needed time to study the legal documents.

On August 7, 2016, the XpresSpa Holdings Board resumed and, except for Mr. Bernstein who abstained, voted unanimously in favor of the merger. Mr. Binn and Mr. Hentz recorded that they voted for the merger with reservations. Mr. Binn stated in an email that day to Mr. Heyer,

Andy, you have frozen me out of any effective role in the management of XpresSpa and the operation and direction of the Board. You have negotiated the proposed transaction while providing limited, curated information to me as a Board member. You brought this deal to the Board for a vote, again providing only limited, selected information and present the transaction as a "do or die" for the Company. No alternatives were presented and you have advised me that either the Board approves this deal now or the company runs out of money. You insist on my vote to proceed.

-4-

> In this context and with grave reservations, under protest as
> to how this transaction has been handled and presented, and in
> all respects relying on your representations that the only
> choices at this point are this deal or the Company goes under,
> you have my reluctant consent.

On August 8, 2016, the XpresSpa Holdings and Form Holdings
Merger Agreement was executed.

The Merger Agreement required holders of 95% of XpresSpa
Holdings units to join the Merger Agreement by signing a Joinder
Agreement. Moreton Binn and Marisol F, LLC owned 17.9% of
XpresSpa Holdings. Thus, they did not need to vote against the
Joinder Agreement; they could have frustrated the Joinder
Agreement, and thus prevented the merger from closing, merely by
abstaining from signing the Joinder Agreement.

However, it appears that Mr. Binn's reservations about the
merger had been allayed, as demonstrated in a November 21, 2016
email, which Mr. Binn sent to certain members of XpresSpa
Holdings:

> Well, with months of negotiating and tons of Legal Documents a
> Closing Date was finally reached. I understand it will be this
> Monday, November 28th, 2016.
>
> A group of us have been working hard, especially over the past
> few weeks, to tighten up the Form Holdings / XpresSpa Holdings
> transaction, trying to make sure the interests of ALL the
> original BINN AND PARTNERS investors are protected as much as
> possible.
>
> We now have a deal that Marisol and I support. "We signed on",
> and if not already, we recommend you ALL join in as well.
>
> Matt Podell sent everyone emails today...one of which is
> attached to this email; giving us the proper documentation and
> instructions. Matt is always available by telephone or email.

He will answer questions you may have...and also assistance in guiding you through the sign-off, if he hasn't done so already. Matt just called to say, "the response to his emails has been welcomed". We now have an opportunity towards eventual liquidity.

According to the rules of the transaction, initially our shares will be locked-up for a short period with some of the Preferred, which has a nice 9% interest coupon, held in Escrow against potential claims. The claims are identified in detail in, I believe, what is referred to as the S4, and in other documentations you should have received...along with a description of the three categories of Form Holdings Interest you will receive in exchange for your XpresSpa Holdings shares (Preferred, Equity and Warrants). FORM HOLDINGS SHARES are publicly listed and traded daily on NASDAQ...full transparency and quarterly reporting.

On November 21, 2016, Mr. Binn and Mrs. Binn faxed copies of their signature pages to the Joinder Agreement to an XpresSpa Holdings attorney, and the merger closed on December 23, 2016.

## This Action

The operative Second Amended Complaint ("SAC") asserts claims of violations of sections 10(b) and 20(a) of the Securities Exchange Act, section 12(a)(2) of the Securities Act, and breach of contract. It alleges that Defendants used the Rockmore Note to take control over Form Holdings' Board and bring about the merger with XpresSpa Holdings. Specifically, it alleges that Defendants used misrepresentations and omissions which induced Plaintiffs to vote for and become parties to the merger, in which Plaintiffs bought Form Holdings stock at artificially inflated prices, and that after the truth was disclosed, the stock price fell. SAC ¶¶ 4-5.

Defendants now move for summary judgment dismissing each of Plaintiffs' claims. Plaintiffs cross-move for partial summary judgment upholding their claim that Defendants misrepresented the merger transaction by concealing Mr. Abbe's interest in the Rockmore Note.

## DISCUSSION

### Discovery

As a preliminary matter, Plaintiffs claim they need discovery to obtain evidence supporting their claims. The summary judgment rules provide for obtaining such discovery. They require

> the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining:
> 1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and
> 2) how those facts are reasonably expected to create a genuine issue of material fact; and
> 3) what efforts the affiant has made to obtain those facts; and
> 4) why those efforts were unsuccessful.

Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 926 (2d Cir. 1985); Fed. R. Civ. P. 56(d).

Plaintiffs have not attempted to make that showing, but merely argue in their brief that they need depositions, documents, and third-party discovery. Under the Rule that showing is insufficient, and it is denied. See Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994) ("A reference to Rule 56(f) and to the need for additional discovery

-7-

in a memorandum of law in opposition to a motion for summary
judgment is not an adequate substitute for a Rule 56(f)
affidavit, and the failure to file an affidavit under Rule 56(f)
is itself sufficient grounds to reject a claim that the
opportunity for discovery was inadequate") (citation omitted);
Papazian v. Sony Music Ent., No. 16 Civ. 7911, 2017 WL 4339662,
at *6 (S.D.N.Y. Sept. 28, 2017) ("Plaintiff has simply posited a
need for further discovery in his memorandum opposing partial
summary judgment, but has not filed any affidavit or declaration
as required by Rule 56(d). This fact alone is sufficient to deny
his request.")

## Summary Judgment

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). "A fact is material if it 'might affect the outcome of
the suit under the governing law,' and a dispute is genuine if
'the evidence is such that a reasonable jury could return a
verdict for the nonmoving party.'" Baldwin v. EMI Feist Catalog,
Inc., 805 F.3d 18, 25 (2d Cir. 2015) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510
(1986)).

A "plaintiff cannot defeat a motion for summary judgment by
merely restating the conclusory allegations contained in his

-8-

complaint, and amplifying them only with speculation about what discovery might uncover." Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 107 (2d Cir. 1981). "Something more than a fanciful allegation is required to justify denying a motion for summary judgment when the moving party has met its burden of demonstrating the absence of any genuine issue of material fact." Id.

1.

### Securities Exchange Act § 10(b) and Rule 10b-5 Claims

To violate section 10(b) and Rule 10b-5, a party must have "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (citation and internal quotation marks omitted).

**A. Misrepresentations regarding the merger generally**

*i) Mr. Bernstein and Mr. Heyer "made statements to the effect that the merger" with Form Holdings was XpresSpa Holdings' "only option," and that the merger with Form Holdings "was more favorable than the merger with Amiral." SAC ¶¶ 78, 97.*

Defendants argue that those statements about the merger were not false and thus not actionable. "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it

-9-

was made." In re Lululemon Sec. Litig., 14 F Supp. 3d 553, 571

(S.D.N.Y. 2014) (emphasis in original).

At XpresSpa Holdings' members meeting on April 28, 2016,

Mr. Heyer discussed XpresSpa Holdings' M&A activity and

reported, "Following the retention of Northpoint to seek new

capital in 2014, the few potential investors that showed

interest at the time lost it as the Company's business

declined." Earley Decl. Ex. D at 2. The presentation

specifically states,

> Oct 2014: Northpoint was hired to raise capital for the
> business, or sell the business to a strategic buyer.
> Northpoint launched an aggressive marketing initiative at the
> end of March 2015
> - 113 Financial sponsors contacted, in addition to 25
>   strategic buyers.
> - 42% of financial sponsors declined to see information; 56%
>   reviewed information and chose to pass on the opportunity; 2%
>   (Pinebridge, Valor) submitted a proposal, but Valor later
>   retracted their offer and, as the business weakened in 2015,
>   Pinebridge also lost interest
> - Strategic buyers contacted: 25; all but one passed on the
>   opportunity.

Id. at 20. The presentation described that on October 1,

2015, after the "private equity marketing process was

unsuccessful," XpresSpa Holdings signed an exclusive letter

of intent to pursue a merger with Amiral-owned BeRelax. Id.

at 21. The minutes of the April 28, 2016 meeting state,

> Massage Envy considered an acquisition but decided XpresSpa
> does not fit with their franchise model. Be Relax then
> expressed interest in merging. XpresSpa has been engaged in
> the merger discussion process with Be Relax since last summer.
> An exclusive LOI to pursue a merger was entered into in
> October 2015, and the Company let it expire in March 2016.

-10-

> That merger process is still underway, and documents have been
> highly negotiated.
>
> However, BDO concluded that Be Relax has very poor financial
> controls, which the Board finds troubling. At the same time,
> Be Relax was spooked by XpresSpa's deteriorating results.
> . . .
> As part of the Be Relax merger discussion, Mr. Kainz commented
> that Be Relax has a poor reputation in Europe and that there
> are rumors that its capital may be derived from suspicious
> sources.

Id. at 2. The minutes of a May 18, 2016 members meeting state,

> Massage Envy was one example of a potential strategic acquirer
> who could not absorb the overhead structure as easily as
> imagined. Mr. Fricke, former CEO of HMS Host, indicated that
> Host was not interested in operating the spa business model
> and Paradies, another airport retail operator, had similar
> feelings. Mr. Phoenix then discussed the outstanding
> discussions with Be Relax and Steiner Leisure. The Company was
> not comfortable with the ability of Be Relax's management to
> more than double store count and continue operating with the
> current level of sophistication. Alternatively, the Steiner
> Leisure offer was unpalatable from an economic stand-point.
> Consequently, the Company has entered into a letter of intent
> with a public entity ("V") to acquire the Company and provide
> growth capital.

Id. Ex. J at 2. The minutes of a June 14, 2016 Board meeting

state, "The company's needs presently amount to $2 Million." Id.

Ex. I at 1. Mr. Binn was present at all three of those meetings.

Id. Exs. D, J, I. At another Board meeting on July 19, 2016 at

which Mr. Binn participated by telephone, Mr. Phoenix "noted

that the company has an urgent need for funds . . . ." Id. Ex. K

at 3. During an August 5, 2016 Board meeting at which Mr. Binn

was present, Mr. Jankowski disclosed that the company was nearly

out of money and that if the Board failed to approve the merger

with Form Holdings, XpresSpa Holdings would likely need to shut

-11-

down and file for bankruptcy in the near future. Id. Ex. M at 2.

Mr. Jankowski also stated that as of December 17, 2016, XpresSpa

Holdings had a cash balance of $17,576, its expenses would

exceed revenue by $295,692 by December 24, 2016, and that absent

bridge financing or completion of the merger with Form Holdings,

it would be unable to make its December 24 payroll. Defs. 56.1

¶ 72.

The evidence shows that Mr. Binn knew that XpresSpa

Holdings needed funding, had explored opportunities with various

companies, and was running out of options. It also shows that

after signing a letter of intent to pursue a merger with Amiral,

XpresSpa Holdings' Board became concerned about Amiral's

financial controls, reputation, and ability to maintain XpresSpa

Holdings' business, and that Amiral became concerned about

XpresSpa Holdings' "deteriorating results." Knowing that

information, both Plaintiffs supported the closing of the

merger, as shown in Mr. Binn's November 21, 2016 email stating,

> A group of us have been working hard, especially over the past
> few weeks, to tighten up the Form Holdings / XpresSpa Holdings
> transaction, trying to make sure the interests of ALL the
> original BINN AND PARTNERS investors are protected as much as
> possible.
>
> We now have a deal that Marisol and I support. "We signed on",
> and if not already, we recommend you ALL join in as well.

Maloney Decl. Ex. 20.

Plaintiffs do not submit any evidence challenging those

statements. Therefore, there is no genuine dispute that Mr. Bernstein and Mr. Heyer's statements reflected the actual state of affairs.

*ii) Mr. Bernstein, Mr. Abbe, Mr. Perlman, and Mr. Giardina (the "Controlling Group") gave XpresSpa Holdings shareholders an appraisal purporting to value the merger consideration at $35,160,098, which was false and misleading because Defendants had inflated the value of Form Holdings' remaining patent monetization assets and cash assets. SAC ¶¶ 115-17.*

Form Holdings retained Innovus Advisors to prepare a valuation of Form Holdings preferred stock, which Form Holdings included in its October 25, 2016 Form S-4/A filed with the SEC.

It was XpresSpa Holdings, not the Controlling Group, which retained Cabrillo Advisors to evaluate the merger consideration being paid to XpresSpa Holdings in Form Holdings stock. It was Cabrillo Advisors whose valuation summary (not Innovus Advisors) estimated the value of purchase consideration at $35,160,098. Maloney Decl. Ex. 14 at 4.

Plaintiffs do not set forth any facts or evidence showing that Defendants inflated the value of Form Holdings assets.

B. Misrepresentations regarding the Rockmore Note and Abbe's interest

*i) Mr. Bernstein told Mr. Binn that "Rockmore could simply sell the Rockmore Note" to Form Holdings and Form Holdings "would obtain ownership" over XpresSpa Holdings "as a result of the default conditions of the Rockmore Note." "This statement was misleading because it omitted the fact that Abbe at that time held both an interest in the Rockmore Note and a position on the board" of Form Holdings. SAC ¶¶ 79-80. Defendants "failed to disclose in the Form S-4 that Abbe held*

-13-

*an interest in the Rockmore Note and that by way of their*
*control over and interest in the Rockmore Note, Bernstein and*
*Abbe would have undue control over the operations" of Form*
*Holdings. Id. ¶ 108.*

Plaintiffs contend that Mr. Abbe has an interest in the

Rockmore Note because he "owns or controls American Capital

Management LLC" ("ACM"), and that ACM has an interest in

Rockmore and the Rockmore Note. Id. ¶ 15; Pls. Opp'n Br. at 28.

In support, Plaintiffs cite a letter regarding the Rockmore

Note, which states,

- In March 2015, XpresSpa required a capital infusion of
  $6MM. The board of XpresSpa looked to Bruce (through
  Rockmore as an investor in XpresSpa) to assist in raising
  the money.
- Rockmore was able to raise the money by April 2015:
  $4,380,000 was raised from persons who were not investors
  in Rockmore at the time (the "Non-Rockmore Investors") and
  $1,620,000 was raised from Brian Daly and one of the
  remaining investors in Rockmore at the time, American
  Capital Management, LLC ("ACM").

Maloney Decl. Ex. 26 at 2. A Schedule 13D of WPCS International

Incorporated states that Mr. Abbe is the managing member of

Iroquois Capital and Iroquois Capital Investment Group LLC, and

that Kimberly Page (not Mr. Abbe) is the manager of ACM as well

as Chief Operating Officer of Iroquois Capital. Id. Ex. 43 at 9.

A Schedule 13G of TapImmune Inc. states that "ACM is a

retirement vehicle for the benefit of Joshua Silverman and

Richard Abbe, members of Iroquois Capital Management LLC, and

others." Id. Ex. 32 at 5. That evidence shows no more than that

ACM was an investor in Rockmore and partially funded the

Rockmore Note, and does not support Plaintiffs' allegation that Mr. Abbe owns or controls either ACM or, by extension, the Rockmore Note.

Any interest Mr. Abbe has in the Rockmore Note through his affiliation with Ms. Page at Iroquois Capital or from the fact that he benefits from ACM was publicly disclosed in WPCS International Incorporated's Schedule 13D and TapImmune Inc.'s 13G. It was also publicly disclosed that Mr. Abbe would be on Form Holdings' Board. Form S-4/A at 14.

Defendants had no duty to disclose that Mr. Abbe held some interest in the Rockmore Note or was on Form Holdings' Board. See In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information.").

Nor is Mr. Abbe's interest in the Rockmore Note material. "[F]or an omission to violate Rule 10b-5, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Glazer v. Formica Corp., 964 F.2d 149, 154-55 (2d Cir. 1992) (citations and internal quotation marks omitted). Form Holdings' Form S-4/A disclosed that "Some of the directors

-15-

and executive officers of FORM have interests in the Merger that
are different from, or in addition to, those of the other FORM
stockholders," that Rockmore was "controlled by FORM's board
member Bruce T. Bernstein," and that "following completion of
the Merger, Rockmore will still be the holder of the Senior
Secured Note." Form S-4/A at 30. Thus, Plaintiffs knew that Mr.
Bernstein controlled Rockmore and the Note but nevertheless
voted for the merger and signed the joinder agreements. The
disclosure of Mr. Abbe's non-controlling interest in the
Rockmore Note would not have "significantly altered the total
mix of information made available." Glazer, 964 F.2d at 154-55.

> *ii) Mr. Bernstein represented that "the Rockmore Note would be
> paid off in full shortly following" the merger. "This
> statement was false because the Controlling Group secretly
> intended not to pay off this obligation and, instead, to use
> it to exert undue control over the publicly listed Company."
> SAC ¶ 91.*

> Form Holdings' Form S-4/A states,

> > XpresSpa is obligated under a senior secured note payable to
> > Rockmore Investment Master Fund Ltd. ("Rockmore"), a
> > significant equity holder of XpresSpa, with an outstanding
> > balance of approximately $6,500,000 (the "Senior Secured
> > Note").
> > . . .
> > After completion of the Merger, the Senior Secured Note will
> > remain outstanding as an obligation of XpresSpa, but will be
> > guaranteed by FORM.
> > . . .
> > Rockmore currently owns equity securities of XpresSpa that are
> > expected to receive approximately 9.5% of the merger
> > consideration and, following completion of the Merger,
> > Rockmore will still be the holder of the Senior Secured
> > Note . . . .

Form S-4/A at 2-3. Due to that disclosure, Plaintiffs knew that

-16-

the Rockmore Note would remain XpresSpa's obligation and be
guaranteed by Form Holdings; the Form S-4/A does not mention
anything about the Rockmore Note being paid off. They therefore
could not have justifiably relied on Mr. Bernstein's
representation that the Rockmore Note would be paid off in full
after the merger. See CL-Alexanders Laing & Cruickshank, 739 F.
Supp. at 165 (granting defendants' motion for summary judgment
on Rule 10b-5 claim because the alleged statements "directly
contradict the clear language of the prospectus," and "Plaintiff
cannot base a fraud claim on an oral representation that
directly contradicts written offering materials"); Brown, 991
F.2d at 1032-33 (finding that "the Limited Partners' asserted
reliance on the brokers' alleged oral statements, without
further inquiry" was "reckless and unjustifiable" because "the
Hutton brokers forwarded the offering materials to the Limited
Partners," which "detailed the investment characteristics
bearing upon suitability" and "contradicted the brokers' alleged
general assurances").

Furthermore, "[a] misrepresentation of future intentions
can be a violation of the securities laws only if the statement
or promise constitutes part of the consideration for the sale or
purchase of securities." S.E.C. v. Norton, No. 95 Civ. 4451,
1997 WL 611556, at *5 (S.D.N.Y. Oct. 3, 1997). Mr. Bernstein's
statement that the Rockmore Note would be paid off after the

merger is a representation of future intentions, and Plaintiffs

do not allege or submit evidence showing that the statement was

in consideration for Plaintiffs' joinder of the merger and

obtainment of Form Holdings shares.

> *iii) Defendants represented in their proxy statements and*
> *other materials that the terms of the Rockmore Note "were*
> *reflective of market rates as of the time of issuance." "This*
> *statement was false and materially misleading because the*
> *terms of the Rockmore Note are onerous on their face." SAC*
> *¶ 111.*

Plaintiffs were aware of the terms of the Rockmore Note

when they approved and executed the April 22, 2015 credit

agreement with Rockmore. Defs. 56.1 ¶ 18; Earley Decl. Exs. E,

F. They do not allege facts or submit evidence showing that the

terms were not reflective of market rates or that the terms are

onerous.

C. Misrepresentations and omissions regarding the independence
   of Form Holdings' Board of Directors

> Form Holdings' Form S-4/A states,

> Each of John Engelman, Donald E. Stout, Salvatore Giardina,
> Bruce T. Bernstein, Andrew R. Heyer, and Richard K. Abbe will
> be deemed "independent" in accordance with the standards set
> by The NASDAQ Capital Market. Each of Messrs. Engelman, Stout,
> Giardina, Bernstein and Abbe will also be deemed "independent"
> in accordance with Rule 10A-3 promulgated under the Securities
> Exchange Act of 1934, as amended, or the Exchange Act.
> Accordingly, the board of directors of FORM will be comprised
> of a majority of independent directors as required by The
> NASDAQ Capital Market.

Form S-4/A at 138.

Defendants argue that there was no misrepresentation in

-18-

stating that the Form Holdings Board was composed of a majority

of independent directors because out of the seven directors, Mr.

Perlman was the only one who was not independent due to his

position as an executive officer—the CEO—of Form Holdings.[1]

Plaintiffs contend that the representation that a majority

of Form Holdings' directors were independent was a

misrepresentation due to Defendants' omissions regarding Form

Holdings' directors' overlapping business relationships, the

Controlling Group's history of exerting control over companies,

and quid pro quo agreements amongst some of Form Holdings'

directors. Each of those omissions is addressed separately

below.

*i) Defendants "failed to disclose and omitted material facts*
*concerning" the Board's "numerous and overlapping business*
*relationships." SAC ¶ 92.*

This relates to the fact that Mr. Abbe and Mr. Giardina

served on the Board of National Holdings Corporation ("NHC")

together and that Mr. Bernstein and Mr. Perlman served on the

Board of Neurotrope Inc. ("Neurotrope") together. However,

"[a]llegations that several of the Board members sit together,

in various configurations, on other boards do not call into

---

[1] Under Rule 5605(a)(2) of the NASDAQ Stock Market Rules, an "independent director" is defined as "a person other than an Executive Officer or employee of the Company or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director."

question the ability of the board members to exercise proper business judgment." In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007) (dismissing claim that board members lacked independence) (citation and internal quotation marks omitted).

It was publicly announced in NHC's July 28, 2014 Form 8-K that Mr. Abbe joined its Board, in Neurotrope's November 14, 2016 Form 8-K that Mr. Bernstein joined its Board, and in Neurotrope's February 22, 2017 Form 8-K that Mr. Perlman joined its Board. Defs. 56.1 ¶¶ 67-70. Form Holdings' Form S-4/A disclosed, "Mr. Giardina is also a director of National Holdings Corporation where he has served since 2012 and has been the chairman of its Audit Committee since 2013." Form S-4/A at 136. Because those facts were in the public domain and available to Plaintiffs, Defendants did not have a duty to disclose the Controlling Group's memberships on other companies' boards, and the representation that a majority of the Form Holdings Board was independent was not false due to those omissions.

*ii) Defendants failed to disclose the Controlling Group's "history of using debt facilities to exert undue control over publicly listed companies." SAC ¶ 110.*

Plaintiffs assert that the Controlling Group has used investment vehicles like Rockmore to take control over other companies (namely NHC, Neurotrope, GeoResources, Inc., USA Technologies, Inc., and TapImmune, Inc.), appoint each other to

-20-

the companies' Boards and committees, and award themselves

valuable stock. Pls. Resp. to Defs. 56.1. ¶¶ 82-85. Plaintiffs

cite exhibits showing that members of the Controlling Group

served together on other companies' boards and committees and

were compensated as directors. That does not raise a genuine

dispute as to whether members of the Controlling Group used debt

facilities to exert "undue control" over those companies. As

previously discussed, Defendants had no duty to disclose public

information regarding the appointment and compensation of

directors on other companies' boards. Furthermore, the

appointment of the Controlling Group's members to other

companies' boards does not contradict the representation that a

majority of Form Holdings' directors are independent. See

Strugala v. Riggio, 817 F. Supp. 2d 378, 388 (S.D.N.Y. 2011)

> it is not enough to charge that a director was nominated by or
> elected at the behest of those controlling the outcome of a
> corporate election. That is the usual way a person becomes a
> corporate director. It is the care, attention and sense of
> individual responsibility to the performance of one's duties,
> not the method of election, that generally touches on
> independence.

(quoting Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984)).

*iii) Defendants failed to disclose various quid pro quo
agreements. To induce Mr. Perlman to bring the merger to a
closing, Mr. Bernstein and Mr. Abbe granted him the maximum
amount of equity compensation allowed under the newly amended
executive compensation plan, and appointed him to the Board of
Neurotrope. Mr. Abbe directed that Mr. Bernstein be appointed
to the Neurotrope Board for his assistance in facilitating the
merger. For Mr. Heyer's support of the merger, the Controlling
Group granted him the maximum amount of equity compensation*

-21-

*allowed, additional Form Holdings shares, and the opportunity for his fund, Mistral, to invest in Form Holdings before the merger. SAC ¶¶ 70-71, 93, 124-25.*

There is no evidence that Mr. Perlman, Mr. Bernstein, or Mr. Heyer were promised compensation, appointment to Form Holdings' and other companies' boards, or the opportunity to invest in Form Holdings in exchange for their support of the merger. That they benefited from the closing of the merger is not sufficient to raise a genuine dispute as to the existence of quid pro quo arrangements.

The compensation and benefits that Mr. Bernstein, Mr. Perlman, and Mr. Heyer received were already publicly disclosed. Regarding Mr. Perlman's compensation, Form Holdings' Form S-4/A states, "From January 1, 2015 through the remainder of the term of the employment agreement, Mr. Perlman will be entitled to receive a base salary of $415,000" and "Mr. Perlman will be eligible to participate in any annual bonus or other incentive compensation program that FORM may adopt from time to time for its executive officers." Form S-4/A at 141. It also states, "On October 13, 2015, FORM entered into an amendment to the existing employment agreement with Mr. Perlman," and "per the amendment, before March 15; 2016, FORM's Compensation Committee shall establish a bonus plan, according to which Mr. Perlman may be eligible to receive an annual performance bonus for the year . . . ." Id. "The bonus entitlement and the amount shall be

-22-

at the sole discretion of the Compensation Committee." Id.
Regarding Mr. Heyer's compensation, a Form Holdings Schedule 13D
disclosed that "on January 17, 2017, in connection with his
service as a director of the Issuer, Mr. Heyer was granted
options to purchase 85,000 shares of the Issuer's common stock,
at an exercise price of $2.12 per share, pursuant to the FORM
2012 Employee, Director and Consultant Equity Incentive Plan . .
. ." Maloney Decl. Ex. 45 at 3. Plaintiffs do not dispute that
each Form Holdings director, not just Mr. Heyer, received his
annual director grant that day. Defs. 56.1 ¶ 66. And as
previously stated, Mr. Bernstein and Mr. Perlman's appointments
to Neurotrope's Board were disclosed in public documents. Id.
¶¶ 67-68.

> *iv) Mr. Heyer told Plaintiffs "that he would be the one voice"*
> *from XpresSpa Holdings "permitted to participate in the*
> *negotiation of the merger so as to be sure that there were no*
> *inconsistent communications." "This statement was false and*
> *misleading because Heyer failed to disclose the quid pro quo*
> *arrangements to which he had agreed, and his true intention*
> *was to conceal the truth from Plaintiffs." SAC ¶ 126.*

Mr. Heyer's statement that he would be "the one voice" from
XpresSpa Holdings during merger negotiations to prevent
inconsistent communications is trivial, not material. The
conclusory charge regarding the alleged quid pro quo
arrangements has been addressed.

> *v) Mr. Engelman and Mr. Stout "had a duty to obtain knowledge*
> *of the truth and accuracy of the disclosures made in materials*
> *filed with the SEC before signing or authorizing the filing of*

*such materials." They "misrepresented, by omission or otherwise, the true nature of the relationship between the Controlling Group by deliberately refraining from taking those steps necessary to discover whether statements by the Controlling Group" and Form Holdings "were false or misleading." SAC ¶ 128.*

The duty to make truthful statements in SEC filings cannot be separated from the accuracy of the statements, which is what is actionable under the Exchange Act. Plaintiffs' allegations that Mr. Engelman and Mr. Stout were under such a duty (with its implication of breach of it) is a claim of breach of fiduciary duty, which was dismissed earlier in this action.

The Form Holdings Board did not owe Plaintiffs a fiduciary duty before the merger closed.

2.

## Other Claims

Plaintiffs assert additional claims of violations of § 20(a) of the Securities Exchange Act, § 12(a)(2) of the Securities Act, and breach of contract. Specifically, they argue that the Controlling Group is liable under § 20(a) of the Exchange Act as the controlling person of Form Holdings, that Defendants are liable under § 12(a)(2) for making material misstatements and omissions in Form Holdings' Form S-4/A, and that Defendants breached the Merger Agreement when they made material misstatements and omissions in their SEC filings.

Because these claims rely on the establishment of

-24-

misstatements or omissions of material fact that have been dealt with, they fail as a matter of law.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. No. 102) is granted. Plaintiffs' cross-motion for partial summary judgment (Dkt. No. 112) is denied.

The motion for oral argument (Dkt. No. 108) is denied.

So ordered.

Dated:    New York, New York
          May 21, 2019

*Louis L. Stanton*

LOUIS L. STANTON
U.S.D.J.

-25-